No. 23-5121

<hr>

### IN THE UNITED STATES COURT OF APPEALS
### FOR THE SIXTH CIRCUIT

_____

UNITED STATES OF AMERICA,
Plaintiff–Appellant,

v.

SHERMAN KELVIN COMBS,
Defendant–Appellee.

_____

On Appeal from the United States District Court for the
Eastern District of Kentucky, No. 5:22-CR-136
(Hon. Danny C. Reeves)

_____

### OPENING BRIEF FOR THE UNITED STATES

_____

CARLTON S. SHIER, IV
United States Attorney

CHARLES P. WISDOM, JR.
Assistant United States Attorney
Eastern District of Kentucky

NICOLE M. ARGENTIERI
Acting Assistant Attorney General

LISA H. MILLER
Deputy Assistant Attorney General

WILLIAM A. GLASER
Attorney, Appellate Section
Criminal Division
U.S. Department of Justice
950 Pennsylvania Ave, NW, Ste. 1264
Washington, DC 20530
(202) 532-4495
William.Glaser@usdoj.gov

# TABLE OF CONTENTS

TABLE OF CONTENTS ..................................................................i

TABLE OF AUTHORITIES ......................................................iii

INTRODUCTION ........................................................................ 1

STATEMENT REGARDING ORAL ARGUMENT................................ 2

STATEMENT OF JURISDICTION............................................... 2

ISSUE PRESENTED ................................................................ 2

STATEMENT OF THE CASE...................................................... 2

    A.    Procedural History................................................... 2

    B.    Relevant Facts ........................................................ 3

    C.    Ruling Under Review ............................................... 4

SUMMARY OF ARGUMENT ..................................................... 8

ARGUMENT ........................................................................... 10

Section 922(g)(8) Is Constitutional Under the Second Amendment. ............ 10

    A.    Legal background ................................................... 11

    B.    Standard of review................................................. 14

    C.    The Court could, but need not, hold this case pending the decision in *Rahimi*................................................... 14

    D.    The Second Amendment allows Congress to disarm persons who are not law-abiding, responsible citizens. ........................... 16

        1.    History confirms the Supreme Court's repeated statements limiting the right to those who are law-abiding and responsible................................................. 17

        2.    Individuals subject to domestic-violence protective orders are not responsible................................................. 19

E.     Section 922(g)(8) is consistent with the historical tradition of disarming dangerous people. .................................................... 22

    1.    There is a well-established historical tradition of disarming those likely to present a danger to themselves or others. ........................................................ 22

        i.    English History ....................................................... 23

        ii.    Early American History ......................................... 26

        iii.    Post-Founding ....................................................... 28

    2.    Section 922(g)(8) is consistent with this tradition. ............. 32

F.     The district court's contrary decision was error .......................... 36

    1.    The government did not waive any arguments by failing to object to the favorable report and recommendation ............................................................. 36

    2.    The district court wrongly concluded that the Second Amendment protects the non-law-abiding and irresponsible. .................................................. 38

    3.    The court improperly demanded a "historical twin." ........ 39

CONCLUSION ........................................................................... 42

CERTIFICATE OF COMPLIANCE ......................................................... 43

CERTIFICATE OF SERVICE ................................................................ 44

DESIGNATION OF DISTRICT COURT RECORD ................................. 45

# TABLE OF AUTHORITIES

## Cases

*Binderup v. Attorney General*,
  836 F.3d 336 (3d Cir. 2016) (en banc) ...................................................... 23

*District of Columbia v. Heller*,
  554 U.S. 570 (2008) ........................................................................ passim

*Folajtar v. Attorney General*,
  980 F.3d 897 (3d Cir. 2020) ...................................................................... 23

*Gerth v. Warden, Allen Oakwood Corr. Inst.*,
  938 F.3d 821 (6th Cir. 2019) ..................................................................... 37

*Griffith v. Kentucky*,
  479 U.S. 314 (1987) .................................................................................. 15

*Kanter v. Barr*,
  919 F.3d 437 (7th Cir. 2019) ................................................... 7, 22, 23, 40

*Major League Baseball Players Ass'n v. Garvey*,
  532 U.S. 504 (2001) .................................................................................. 15

*Marsalis v. Pennsylvania Dep't of Corr.*,
  37 F.4th 885 (3d Cir. 2022) ...................................................................... 38

*McIntyre v. Ohio Elections Commission*,
  514 U.S. 334 (1995) .................................................................................. 33

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*,
  142 S. Ct. 2111 (2022) ...................................................................... passim

*Patterson v. Winn*,
  30 U.S. (5 Pet.) 233 (1831) ...................................................................... 26

*Robertson v. Baldwin*,
  165 U.S. 275 (1897) .................................................................................. 17

*Souter v. Jones*,
   395 F.3d 577 (6th Cir. 2005) ................................................................. 37

*State v. Davis*,
   5 S.C.L. (3 Brev.) 3 (S.C. Const. Ct. App. 1811) ..................................... 34

*State v. Hogan*,
   58 N.E. 572 (Ohio 1900) ...................................................................... 31

*State v. Shelby*,
   2 S.W. 468 (Mo. 1886) ........................................................................ 31

*Thompson v. Thompson*,
   218 U.S. 611 (1910) ............................................................................ 34

*Turpin v. Kassulke*,
   26 F.3d 1392 (6th Cir. 1994) ................................................................ 37

*United States v. Bedford*,
   914 F.3d 422 (6th Cir. 2019) ................................................................ 14

*United States v. Brown*,
   --- F. Supp. 3d ---, 2023 WL 4826846 (D. Utah July 27, 2023) ................. 14

*United States v. Castleman*,
   572 U.S. 157 (2014) ........................................................................ 1, 19

*United States v. Emerson*,
   270 F.3d 203 (5th Cir. 2001) ............................................................ 13, 32

*United States v. Emmons*,
   8 F.4th 454 (6th Cir. 2021) .................................................................. 14

*United States v. Fryer*,
   545 F.2d 11 (6th Cir. 1976) ................................................................... 8

*United States v. Goins*,
   No. 5:22-CR-91, 2022 WL 17836677 (E.D. Ky. Dec. 21, 2022) ............... 38

*United States v. Guthery*,
   No. 2:22-CR-173, 2023 WL 2696824 (E.D. Cal. Mar. 29, 2023) .............. 14

iv

*United States v. Hayes*,
   555 U.S. 415 (2009) ................................................................. 1

*United States v. Jackson*,
   69 F.4th 495 (8th Cir. 2023) ................................................. 17

*United States v. Jordan*,
   No. 5:22-CR-339, Doc. 29 (W.D. Okla. Oct. 25, 2022)........................... 14

*United States v. Kays*,
   624 F. Supp. 3d 1262 (W.D. Okla. 2022) ................................. 14

*United States v. Lewis*,
   No. 21-CR-789, 2023 WL 6066260 (S.D.N.Y. Sep. 18, 2023) ................. 14

*United States v. Rahimi*,
   61 F.4th 443 (5th Cir.), *cert. granted*, 143 S. Ct. 2688 (2023)...................... 13

*United States v. Robinson*,
   No. 4:22-CR-165, 2023 WL 3167861 (E.D. Mo. May 1, 2023) ............... 14

*United States v. Silvers*,
   --- F. Supp. 3d ---, 2023 WL 3232605 (W.D. Ky. May 3, 2023) ............... 14

*United States v. Skoien*,
   614 F.3d 638 (7th Cir. 2010) ....................................................... 20

## Federal Constitution, Rules, and Statutes

U.S. Const. amend. II ................................................................. 11

18 U.S.C. § 921 .......................................................................... 13

18 U.S.C. § 922 ................................................................. passim

18 U.S.C. § 3231 ......................................................................... 2

18 U.S.C. § 3731 ......................................................................... 2

Fed. R. App. P. 4 ........................................................................ 2

Fed. R. Crim. P. 59 ................................................................... 37

Federal Firearms Act, ch. 850, 52 Stat. 1251 ................................................. 33

**State Statutes**

1 *General Public Statutory Law and Public Local Law of the State of Maryland, from the Year 1692 to 1839 Inclusive: With Annotations Thereto, and a Copious Index* (1840) .......................................................... 28

1 *Laws of the State of Delaware from the Fourteenth Day of October, One Thousand Seven Hundred, to the Eighteenth Day of August, One Thousand Seven Hundred and Ninety-Seven* (1797) ...................................... 28

13 *Statutes at Large; Being a Collection of All the Laws of Virginia, from the first Session of the Legislature, in the Year 1619* (1823) .................................. 28

2 *Statutes at Large of Pennsylvania from 1682 to 1801* (1896) .............................. 28

Ordinance of Oct. 9, 1652, *Laws and Ordinances of New Netherland, 1638-1674* (E.B. O'Callaghan ed., 1868) .................................................. 26

Act of Nov. 1, 1692, ch. 18, § 6, 1 *Acts and Resolves of the Province of Massachusetts Bay* (1869) .................................................................. 26, 27

Act of June 14, 1701, ch. 7, 1 *Laws of New Hampshire* (Albert Stillman Batchellor ed., 1904) ......................................................................... 26, 27

Act of Mar. 1, 1783, ch. 46, 1782-83 Mass. Acts 120 (1890) ......................... 26

Act of Dec. 6, 1783, ch. 1059, § 1, 11 *The Statutes at Large of Pennsylvania from 1682 to 1801* (1906) ....................................................... 27

Act of Nov. 27, 1786, ch. 21, *A Collection of all such Acts of the General Assembly of Virginia, of a Public and Permanent Nature, as are now in Force* (1794) ............................................................................... 26

Act of Mar. 15, 1788, ch. 81, § 1, 2 *Laws of the State of New-York* (2d ed. 1807) ..................................................................................... 27

Act of Feb. 18, 1794, § 1, *The Laws of the State of New Hampshire* (1815) ......... 26

Mass. Rev. Stat. ch. 134, § 16 (1836) ......................................................... 29

Act of Feb. 2, 1856, No. 26, § 1, 1856 Ala. Acts 17 ....................................... 30

Act of Feb. 26, 1856, ch. 81, § 2, 1856 Tenn. Acts 92 ................................... 30

Act of Feb. 23, 1867, ch. 12, § 1, 1867 Kan. Sess. Laws 25 .......................... 31

Ky. Gen. Stat. ch. 29, Art. 29, § 1 (Edward I. Bullock & William
    Johnson eds., 1873) ................................................................................ 30

Act of Feb. 27, 1875, ch. 40, § 1, 1875 Ind. Laws 59 .................................... 30

Act of Feb. 17, 1876, No. 128, § 1, 1876 Ga. Laws 112 ................................. 30

Act of Feb. 28, 1878, ch. 46, § 2, 1878 Miss. Laws 175 ................................. 31

Act of Aug. 1, 1878, ch. 38, § 2, 1878 N.H. Laws 170 ................................... 31

Act of Nov. 26, 1878, No. 14, § 3, 1878 Vt. Acts & Resolves 30 ................... 31

Act of Mar. 4, 1879, ch. 188, § 4, 1879 Wis. Sess. Laws 274 ......................... 31

Act of Mar. 12, 1879, ch. 198, § 2, 1879 N.C. Sess. Laws 355 ...................... 31

Act of Mar. 27, 1879, ch. 59, § 4, 1879 Conn. Pub. Acts 394 ........................ 30

Act of Mar. 27, 1879, ch. 155, § 8, 16 Del. Laws 225 (1879) ................... 30, 31

Act of Apr. 30, 1879, § 2, 1879 Pa. Laws 34 ................................................. 31

Act of June 12, 1879, § 2, 1879 Ohio Laws 192 ............................................ 31

1 Mo. Rev. Stat. ch. 24, Art. II, § 1274 (1879) ............................................. 31

Act of Mar. 25, 1880, § 1, 1880 Ohio Laws 79-80 ........................................ 30

Act of Apr. 9, 1880, ch. 806, § 3, 1880 R.I. Acts & Resolves 110 ................. 31

Act of Apr. 24, 1880, ch. 257, § 4, 1880 Mass. Acts 232 ................................ 31

Act of May 5, 1880, ch. 176, § 4, 1880 N.Y. Laws, Vol. 2, at 297 ................. 31

Miss. Rev. Code ch. 77, § 2964 (1880) .......................................................... 31

Act of Feb. 4, 1881, ch. 3285, No. 67, § 1, 1881 Fla. Laws 87 ...................... 30

Act of Apr. 8, 1881, ch. 548, § 1, 16 Del. Laws 716 (1881) ........................... 30

Act of Apr. 16, 1881, § 2, 1881 Ill. Laws 73 ................................................... 30

Act of June 10, 1881, § 1, 1881 Pa. Laws 111-112......................................... 30

Act of Feb. 10, 1882, ch. 4, §§ 1-2, 1882 N.J. Acts 13-14 ............................. 30

Act of May 3, 1882, ch. 424, § 2, 1882 Md. Laws 656................................... 30

Act of Mar. 5, 1883, ch. 105, § 1, 1883 Kan. Sess. Laws 159 ........................ 30

Act of Mar. 29, 1882, ch. 135, § 1, 1882 W. Va. Acts 421.............................. 30

Act of Apr. 3, 1883, ch. 329, § 2, 1883 Wis. Sess. Laws, Vol. 1.................... 30

Act of Apr. 13, 1883, ch. 374, § 1, 1883 R.I. Acts & Resolves 157 ............... 30

Act of May 10, 1883, § 1, ch. 375, 1883 N.Y. Laws 556................................ 30

Act of June 2, 1883, No. 138, § 1, 1883 Mich. Pub. Acts 144 ....................... 30

Act of Nov. 26, 1883, § 1, 1883 Laws of the Territory of Wash. 67............... 30

Act of Mar. 29, 1884, ch. 78, § 1, 1884 Iowa Acts 86 ................................... 30

Act of Mar. 2, 1885, ch. 51, § 1, 1885 Nev. Stat. 51 ..................................... 30

Act of May 3, 1890, ch. 43, § 4, 1890 Iowa Acts 69...................................... 31

Act of Mar. 14, 1890, ch. 73, § 97, 1890 Wyo. Territory Sess. Laws
    140 .............................................................................................................. 30

Act of July 1, 1890, No. 46, § 1, 1890 La. Acts 39......................................... 30

Act of July 13, 1892, ch. 159, § 5, 27 Stat. 117 (D.C.) .................................. 30

Act of Mar. 6, 1893, ch. 514, § 1, 1893 N.C. Pub. Laws 468......................... 30

Act of Nov. 16, 1896, No. 111, § 1, 1896 Vt. Acts & Resolves 83 ................ 30

Act of 1897, ch. 155, § 1, 1897 Tex. Gen. Laws 221 ..................................... 30

Act of Feb. 17, 1899, ch. 1, § 52, 1899 N.C. Pub. Laws 20-21 ..................... 30

*Acts and Laws of His Majesties Colony of Connecticut in New-England* (1901) ......................................................................................................... 28

**Other Authorities**

Theodore Barlow, *The Justice of Peace* (1745) ................................................ 24

Jeremy Belknap to Ebenezer Hazard (Feb. 10, 1788), in 7 *Documentary History* (John P. Kaminski & Gaspare J. Saladino eds., 2001) ................. 19

Anthony A. Braga et al., *Firearm Instrumentality: Do Guns Make Violent Situations More Lethal*, 2021 Ann. Rev. Criminology 147 ......................... 20

Nick Bruel & Mike Keith, *Deadly Calls and Fatal Encounters: Analysis of U.S. law enforcement line of duty deaths when officers responded to dispatched calls for service and conducted enforcement, 2010-2014* (2016) ........... 21

1 Richard Burn, *The Justice of the Peace, and Parish Officer* (2d ed. 1756) .......... 25

*Calendar of State Papers, Domestic Series, Of the Reign of William III, 1 April, 1700–8 March, 1702* (Feb. 26, 1701) (Edward Bateson ed., 1937) ..................................................................................................... 24

Reinie Cordier et al., *The Effectiveness of Protection Orders in Reducing Recidivism in Domestic Violence: A Systematic Review and Meta-Analysis*, 22 Trauma, Violence, & Abuse 804 (2021) ............................... 21

James Davis, *The Office and Authority of a Justice of Peace* (1774) .................... 26

6 *Documentary History* (John P. Kaminski & Gaspare J. Saladino eds., 2000) ......................................................................................................... 18

2 Edw. 3, c. 3 (1328) (Eng.) ......................................................................... 25

Joseph Gales, *Prevention of Crime*, *in* O.H. Smith, *Early Indiana Trials and Sketches* (1858) ................................................................................. 29

Robert Gardiner, *The Compleat Constable* (3d ed. 1708) ................................. 24

Lisa B. Geller et al., *The role of domestic violence in fatal mass shootings in the United States, 2014-2019*, 8 Injury Epidemiology 38 (2021) ................... 22

Joseph Greenleaf, *An Abridgment of Burn's Justice of the Peace and Parish Officer* (1773)....................................................................................... 26

Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 Wyo. L. Rev. 249 (2020).....22, 23

1 William Hawkins, *A Treatise of the Pleas of the Crown* (1716)........................ 25

William Waller Hening, *The New Virginia Justice* (1795) ............................... 26

John Holmes, *The Statesman, or Principles of Legislation and Law* (1840) .......... 28

G. Jacob, *Lex Constitutionis* (2d ed. 1737) .................................................... 24

Giles Jacob, *The Modern Justice* (1716) ........................................................ 24

Aaron J. Kivisto & Megan Porter, *Firearm Use Increases Risk of Multiple Victims in Domestic Homicides*, 48 J. Am. Acad. Psychiatry L. 26 (2020) ............................................................................................ 19

Tom Lininger, *A Better Way to Disarm Batterers*, 54 Hast. L.J. 525 (Mar. 2003) ............................................................................................. 21

TK Logan et al., *Relationship Characteristics and Protective Orders Among a Diverse Sample of Women*, 22 J. Fam. Violence 237 (2007) ...................... 20

Eliphalet Ladd, *Burn's Abridgment, Or The American Justice* (2d ed. 1792) ............................................................................................. 26

Lord Lonsdale to Deputy Lieutenants of Cumberland (May 20, 1722), *in* Historical Manuscripts Commission, *Fifteenth Report, Appendix, Part VI* (1897) .................................................................................. 24

Kellie R. Lynch et al., *Firearm-related Abuse and Protective Order Requests Among Intimate Partner Violence Victims*, 37 J. Interp. Violence 12,974 (2021) ............................................................................... 20

Joyce Lee Malcolm, *To Keep and Bear Arms: The Origins of an Anglo-American Right* (1994) ............................................................... 25

Militia Act 1662, 13 & 14 Car. 2, c. 3, § 13 .................................. 23

Nat'l Inst. of Justice, Office of Justice Programs, U.S. Dep't of Justice, *Special Report*, *Practical Implications of Current Domestic Violence Research: For Law Enforcement, Prosecutors and Judges* 26 (June 2009) .......... 20

W. Nelson, *The Office and Authority of a Justice of Peace* (7th ed. 1721) ............. 24

Diarmuid F. O'Scannlain, *Glorious Revolution to American Revolution: The English Origin of the Right to Keep and Bear Arms*, 95 Notre Dame L. Rev. 397 (2019) ..................................................................... 24

Order of Council to Lord Lieutenants (Sept. 5, 1745), *in* Historical Manuscripts Commission, *Report on the Manuscripts of the Marquess of Lothian, Preserved at Blickling Hall, Norfolk* (1905) .................................. 24

James Parker, *Conductor Generalis* (1764) ...................................... 26

James Parker, *Conductor Generalis* (Robert Campbell printing 1792) .............. 26

James Parker, *Conductor Generalis* (Robert Hodge printing 1788) .................. 26

Privy Council to the Earl of Carlisle (July 30, 1714), *in* Historical Manuscripts Commission, *Tenth Report, Appendix, Part IV* (1885) ............. 24

William Rawle, *A View of the Constitution of the United States of America* (2d ed. 1829) ........................................................................ 28

Tapping Reeve, *The Law of Baron and Femme; of Parent and Child; of Guardian and Ward; of Master and Servant; and of the Powers of Courts of Chancery* 65 (New Haven, Oliver Steele 1816) ...................................... 34

Randolph Roth*, American Homicide* (2009) ..................................... 34

Randolph Roth, *Why Guns Are and Are Not the Problem*, *in* Jennifer Tucker et al. eds., *A Right to Bear Arms?: The Contested Role of History in Contemporary Debates on the Second Amendment* (2019) ...................... 29, 35

2 Bernard Schwartz, *The Bill of Rights: A Documentary History* (1971) ............. 18

2 Joseph Shaw, *The Practical Justice of Peace, and Parish and Ward-Officer* (6th ed. 1756) ..................................................................... 24

Stephen M. Shapiro et al., Supreme Court Practice § 4.18 (10th ed. 2013) ............................................................................. 15

Reva B. Siegel, *"The Rule of Love": Wife Beating as Prerogative and Privacy*, 105 Yale L.J. 2117 (1996) ........................................... 34

Sharon G. Smith et al., *Intimate Partner Homicide and Corollary Victims in 16 States: National Violent Death Reporting System, 2003-2009*, 104 Am. J. Pub. Health 461 (Mar. 2014) ...................................... 21

*State Convention of the Suffrage men of Rhode Island*, Vermont Gazette, Dec. 13, 1842 ...................................................... 29

Violence Policy Center, *When Men Murder Women: An Analysis of 2018 Homicide Data* (Sept. 2020) .................................................. 35

1 W. & M. Sess. II, c. 2 (1688) (Eng.) ........................................ 24

1 W. & M., ch. 2, § 7, in 3 Eng. Stat. at Large 441 ...................... 17

## INTRODUCTION

"Firearms and domestic strife are a potentially deadly combination."
*United States v. Hayes*, 555 U.S. 415, 427 (2009). "All too often, . . . the only
difference between a battered woman and a dead woman is the presence of a
gun." *United States v. Castleman*, 572 U.S. 157, 160 (2014) (brackets and
quotation marks omitted). To combat that threat, Congress passed 18 U.S.C.
§ 922(g)(8), which prohibits firearm possession while subject to a domestic-
violence restraining order.

The district court incorrectly held that § 922(g)(8) violates the Second
Amendment on its face. In so doing, the district court misapplied *New York
State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), which confirmed
that the Second Amendment protects only the right of law-abiding, responsible
citizens. Section 922(g)(8) disarms only the irresponsible, and the provision is
consistent with the historical tradition of disarming lawbreakers and those who
pose a danger to others. It is therefore constitutional.

The Supreme Court is poised to rule on § 922(g)(8)'s constitutionality
this term. *See United States v. Rahimi*, No. 22-915. This Court could hold this
appeal pending the Supreme Court's decision, but it need not do so. If it does
not hold the case, this Court should reverse the district court's mistaken
decision.

## STATEMENT REGARDING ORAL ARGUMENT

Because this case presents a constitutional question of first impression within this circuit, the government believes oral argument would assist the Court in deciding the case.

## STATEMENT OF JURISDICTION

The United States appeals from the district court's order dismissing one count of an indictment against Defendant–Appellee Sherman Combs. The district court (Reeves, C.J.) had jurisdiction under 18 U.S.C. § 3231. The court entered its order dismissing one count of the indictment on February 2, 2023. Memorandum Opinion and Order, R.33, Page ID #131-43. The government filed a timely notice of appeal on February 8, 2023. Notice of Appeal, R.35, Page ID #145-46; *see* Fed. R. App. P. 4(b)(1)(B)(i). This Court has jurisdiction under 18 U.S.C. § 3731.

## ISSUE PRESENTED

Whether 18 U.S.C. § 922(g)(8)'s prohibition on possessing a firearm while subject to a domestic-violence restraining order violates the Second Amendment.

## STATEMENT OF THE CASE

### A.   Procedural History

A grand jury in the Eastern District of Kentucky charged Combs with possession of a firearm while subject to a domestic-violence restraining order,

in violation of 18 U.S.C. § 922(g)(8) (Count 1); and making a false statement in connection with the acquisition of a firearm, in violation of 18 U.S.C. § 922(a)(6) (Count 2).  Indictment, R.5, Page ID #10-11.  The district court dismissed Count 1 of the indictment, Memorandum Opinion and Order, R.33, Page ID #131-43, and this appeal followed.

### B.    Relevant Facts

In June 2022, Combs's intimate partner petitioned the Harrison County Family Court for a domestic violence restraining order under Kentucky law. Affidavit in Support of Application for a Criminal Complaint, R.1-1, Page ID #3.  Both Combs and his intimate partner appeared at the hearing.  R.1-1, Page ID #3.  The family court entered an order prohibiting Combs from having contact or communication with the intimate partner and restraining Combs "from any further acts of abuse or threats of abuse, stalking, or sexual assault."  R.1-1, Page ID #3.  The order stated that Combs could not possess or purchase firearms and warned him that doing so may violate federal law. R.1-1, Page ID #4.

According to the indictment, about three days after the restraining order was entered, Combs purchased a .357 caliber revolver from a federally licensed firearms dealer.  Indictment, R.5, Page ID #10-11.  In connection with that sale, Combs allegedly falsely represented that he was not subject to a court

3

order restraining him from harassing, stalking, or threatening an intimate partner or child.  R.5, Page ID #11.

Within two weeks of the restraining order's issuance, Combs allegedly violated the order by texting his intimate partner five times and leaving two voicemails.  R.1-1, Page ID #4.  A court issued an arrest warrant based on Combs's violation of the restraining order.  R.1-1, Page ID #4.  When a sheriff's deputy arrested him, Combs said he had a firearm in a holster on his right hip.  R.1-1, Page ID #4.  The deputy seized the firearm, a .357 caliber revolver.  R.1-1, Page ID #4.  After receiving *Miranda* warnings, Combs spoke to agents with the Bureau of Alcohol, Tobacco, Firearms, and Explosives and admitted that he knew that the active restraining order prohibited him from possessing firearms.  R.1-1, Page ID #4.

## C.    Ruling Under Review

A grand jury charged Combs with possession of a firearm while subject to a domestic violence restraining order, in violation of 18 U.S.C. § 922(g)(8) (Count 1); and making a false statement in connection with the acquisition of a firearm, in violation of 18 U.S.C. § 922(a)(6) (Count 2).  Indictment, R.5, Page ID #10-11.  Combs moved to dismiss both counts, arguing that § 922(g)(8) violates the Second Amendment under *New York Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), and that therefore his false statement that he was

4

not subject to a domestic violence restraining order was not material and did not violate § 922(a)(6).  Memorandum of Law in Support of Motion to Dismiss, R.23-1, Page ID #52-58.

### 1.    Magistrate judge's report and recommendation

The magistrate judge issued a report and recommendation recommending denial of the motion to dismiss on both counts.  Report & Recommendation, R.27, Page ID #100-119.  The magistrate judge concluded that § 922(g)(8) was "presumptively unconstitutional," rejecting the government's argument that those subject to § 922(g)(8) are not "law-abiding citizen[s]" protected by the Second Amendment.  R.27, Page ID #104 (quoting *Bruen*, 142 S. Ct. at 2122).  In the magistrate judge's view, "the plain text of the Second Amendment is not limited only to law-abiding citizens."  R.27, Page ID #104.

The magistrate judge nevertheless determined that the government had "met its burden of showing that § 922(g)(8) is consistent with this Nation's historical tradition of firearm regulation."  R.27, Page ID #118.  Although the magistrate judge found no specific historical tradition of disarming people based on "the threat of intimate partner violence," he did find "a long-standing tradition of removing firearms from the possession of those individuals that society has deemed a danger."  R.27, Page ID #107.  Specifically, the

magistrate judge concluded that historical surety laws were analogous to
§ 922(g)(8) in how and why they regulated firearm possession.  R.27, Page ID
#109-14.

### 2.     District court's order

The district court adopted the report and recommendation in part and
rejected it in part, granting Combs's motion to dismiss as to Count 1 but
denying it as to Count 2.  Memorandum Opinion and Order, R.33, Page ID
#131-43.  Like the magistrate judge, the district court concluded that "the
Constitution presumptively protects [Combs's] right to possess a firearm under
the plain text of the Second Amendment," regardless of whether he is "a law-
abiding, responsible citizen."  R.33, Page ID #136.  The court also concluded
that the government waived any argument that Combs was not a law-abiding,
responsible citizen by failing to object to the magistrate judge's contrary
conclusion.  R.33, Page ID #136-37.

The court next found that the government had "fail[ed] to satisfy its
burden" of showing that § 922(g)(8) is consistent with the Nation's historical
tradition of firearm regulation.  R.33, Page ID #141.  The court rejected the
government's reliance on historical surety statutes, concluding that, under
"*Bruen*'s first metric," "*how* the law burdens an individual's right to armed self-
defense[ ]is markedly different."  R.33, Page ID #139.  The court pointed out

that § 922(g)(8) "is a complete deprivation of an individual's ability to possess a firearm for the length of the" protective order, whereas the surety statutes allowed a person to carry firearms by "posting a bond or showing a special need for self-defense." R.33, Page ID #139.

The district court suggested that the government "waived" its reliance on any "historical laws other than surety statutes" by "fail[ing] to timely object" to the report and recommendation. R.33, Page ID #140. But it concluded that, in any event, the government "did not satisfy its burden." R.33, Page ID #140. The court considered and rejected an analogy to historical laws disarming loyalists who refused to swear a loyalty oath. R.33, Page ID #140. The court found it "unclear how an oath is similar to section 922(g)(8)'s complete deprivation for the length of the [restraining order] because '[t]hose willing to swear undivided allegiance to the sovereign were permitted to keep their arms.'" R.33, Page ID #140 (some quotation marks omitted) (quoting *Kanter v. Barr*, 919 F.3d 437, 457 (7th Cir. 2019) (Barrett, J., dissenting)). And these laws did not "satisfy *Bruen*'s second metric (i.e. *why* the regulation burdens an individual's right)" because they were designed to deal with "the potential threat coming from armed citizens who remained loyal to another sovereign." R.33, Page ID #141 (some quotation marks omitted) (quoting *Kanter*, 919 F.3d at 457 (Barrett, J., dissenting)).

7

Because the government "failed to provide a comparable historical analogue" for § 922(g)(8), the court dismissed Count 1.  R.33, Page ID #132. The court nevertheless denied the motion to dismiss as to Count 2.  R.33, Page ID #141-42.  It cited this Court's holding that, "if a felony conviction is not disclosed at the time the firearm is purchased, there would be a violation of 922(a)(6) even though later the conviction is found to be infirm for constitutional reasons."  R.33, Page ID #142 (quoting *United States v. Fryer*, 545 F.2d 11 (6th Cir. 1976)).  And it reasoned that "[t]he same holds true" in this case, where Combs falsely denied being subject to a domestic violence restraining order.[1]  R.33, Page ID #142.

## SUMMARY OF ARGUMENT

The district court erred by holding that 18 U.S.C. § 922(g)(8)'s prohibition on firearm possession while subject to a domestic violence restraining order violates the Second Amendment.  That provision is consistent with both the Second Amendment's text and America's historical tradition of firearm regulation.

---

[1] Combs attempted to appeal the denial of his motion to dismiss Count 2, but this Court dismissed the cross-appeal for lack of jurisdiction.  *See* Order, No. 23-5153 (6th Cir. Sep. 12, 2023).

The Court could hold this case in abeyance pending the Supreme Court's decision in *United States v. Rahimi*, No. 22-915, which will resolve the question presented. But the Court need not do. Other avenues of relief would be available to Combs if the Supreme Court were to subsequently invalidate § 922(g)(8). And there are strong reasons to conclude that the statute is constitutional.

The Supreme Court has made clear that the Second Amendment protects the "right of law-abiding, responsible citizens" to bear arms. *District of Columbia v. Heller*, 554 U.S. 570, 635 (2008). That authoritative interpretation of the amendment's scope is consistent with the historical understanding of the right. For example, the English Bill of Rights and the ratification debates surrounding the United States Constitution reflect an understanding that the right to bear arms did not extend to lawbreakers and the irresponsible. And those who, like Combs, are subject to qualifying domestic-violence restraining orders are not responsible. To trigger § 922(g)(8), a restraining order must be based on a finding that the person threatens the safety of an intimate partner or child. And statistical evidence confirms that allowing domestic abusers to possess firearms poses a serious risk of further abuse and even homicide. So § 922(g)(8) is a constitutional exercise of Congress's power to disarm those who are irresponsible.

Additionally, § 922(g)(8) is consistent with the nation's historical tradition of firearm regulation.  For example, the English Militia Act of 1662 allowed officials to disarm those they judged dangerous to the peace of the kingdom.  The common law tradition, codified in several American colonies, allowed justices of the peace to disarm and punish those who went armed to the terror of the people.  And laws enacted after the founding confirm a common understanding that dangerous and irresponsible people could be disarmed.  Accordingly, there is a virtually unchallenged consensus among courts and scholars that disarming those who pose a danger to others is consistent with the historical tradition.

In concluding otherwise, the district court incorrectly concluded that the government waived certain arguments by failing to object to the magistrate judge's favorable report and recommendation.  And the district court overlooked § 922(g)(8)'s key similarities to historical laws, improperly demanding a "historical twin."  This Court should reverse.

## ARGUMENT

### Section 922(g)(8) Is Constitutional Under the Second Amendment.

The district court erred by holding that § 922(g)(8) violates the Second Amendment.  That provision disarms only irresponsible persons, and it is consistent with a historical tradition of disarming those who pose a danger to

10

others.  This Court should either hold this appeal pending the Supreme Court's

decision in *Rahimi* or reverse the decision below.

### A.    Legal background

The Second Amendment provides: "A well regulated Militia, being

necessary to the security of a free State, the right of the people to keep and bear

Arms, shall not be infringed."  U.S. Const. amend. II.  In *District of Columbia v.*

*Heller*, 554 U.S. 570, 635 (2008), the Supreme Court held that the Second

Amendment protects the right of "law-abiding, responsible citizens" to keep

firearms in their homes for self-defense.  But *Heller* clarified that, "[l]ike most

rights, the right secured by the Second Amendment is not unlimited."  *Id.* at

626.

In *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2122

(2022), the Supreme Court held that the Second Amendment protects the right

of "ordinary, law-abiding citizens" to "carry a handgun for self-defense outside

the home."  *Bruen* struck down a New York law that required residents to

demonstrate a "proper cause" to obtain a license to carry a handgun outside

the home because that law "prevent[ed] law-abiding citizens with ordinary self-

defense needs from exercising their right to keep and bear arms."  *Id.* at 2122,

2156.

*Bruen* rejected the "two-step" framework adopted by most courts of appeals after *Heller* that "combine[d] history with means-end scrutiny." *Bruen*, 142 S. Ct. at 2125-26. And *Bruen* "reiterate[d]" the "standard for applying the Second Amendment." *Id.* at 2129. First, "[w]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Id.* at 2129-30. Second, when a regulation burdens such conduct, "[t]he government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2130.

In considering whether a modern regulation is "relevantly similar" to historical laws, courts should consider "at least two metrics: how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Bruen*, 142 S. Ct. at 2132-33. That is, the "central" considerations are "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified." *Id.* at 2133 (emphasis and quotation marks omitted). The government need only identify "a well-established and representative historical *analogue*, not a historical *twin*." *Id.* "[E]ven if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Id.*

12

Section 922(g)(8), which Congress enacted in 1994, prohibits a person subject to a qualifying domestic-violence restraining order from possessing a firearm in or affecting commerce.  To trigger § 922(g)(8), a restraining order must satisfy three conditions.  First, a court must have issued the order after giving the person subject to it notice and an opportunity to be heard.  18 U.S.C. § 922(g)(8)(A).  Second, the order must forbid the person from harassing, stalking, or threatening an "intimate partner," the person's child, or an intimate partner's child.  18 U.S.C. § 922(g)(8)(B); *see* 18 U.S.C. § 921(a)(32) (defining "intimate partner").  Third, the order must either (1) include a finding that the person poses a "credible threat" to the physical safety of the intimate partner or child or (2) explicitly prohibit the use, attempted use, or threatened use of physical force against the intimate partner or child.  18 U.S.C. § 922(g)(8)(C).  As the Fifth Circuit has observed, a court ordinarily will enter this second prohibition only if "evidence credited by the court reflected a real threat or danger of injury to the protected party."  *United States v. Emerson*, 270 F.3d 203, 262 (5th Cir. 2001).

Relying on *Bruen*, the Fifth Circuit held that § 922(g)(8) is facially unconstitutional under the Second Amendment, *United States v. Rahimi*, 61 F.4th 443 (5th Cir.), and the Supreme Court granted certiorari, 143 S. Ct. 2688 (2023).  The decision below is the only district-court decision outside the Fifth

Circuit that has found § 922(g)(8) unconstitutional.  All other district courts to consider § 922(g)(8)'s constitutionality since *Bruen* have upheld the statute.[2]

## B.    Standard of review

"In reviewing a motion to dismiss an indictment, this court reviews the district court's legal conclusions *de novo* and its factual findings for clear error or abuse of discretion."  *United States v. Bedford*, 914 F.3d 422, 426 (6th Cir. 2019).  The constitutionality of § 922(g)(8) is a legal question that is reviewed *de novo.  See United States v. Emmons*, 8 F.4th 454, 465 (6th Cir. 2021).

## C.    The Court may, but need not, hold this case pending the decision in *Rahimi*.

Because the Supreme Court will soon resolve the question presented here, this Court may choose to hold this appeal in abeyance pending the decision in *Rahimi*.  The government did not request such a hold, however, for several reasons.  First, Combs has been subject to home incarceration (recently modified to home detention) as a condition of his pretrial release on the

---

[2] *See United States v. Lewis*, No. 21-CR-789, 2023 WL 6066260 (S.D.N.Y. Sep. 18, 2023); *United States v. Brown*, --- F. Supp. 3d ---, 2023 WL 4826846 (D. Utah July 27, 2023); *United States v. Silvers*, --- F. Supp. 3d ---, 2023 WL 3232605 (W.D. Ky. May 3, 2023); *United States v. Robinson*, No. 4:22-CR-165, 2023 WL 3167861 (E.D. Mo. May 1, 2023); *United States v. Guthery*, No. 2:22-CR-173, 2023 WL 2696824 (E.D. Cal. Mar. 29, 2023); *United States v. Jordan*, No. 5:22-CR-339, Doc. 29 (W.D. Okla. Oct. 25, 2022); *United States v. Kays*, 624 F. Supp. 3d 1262 (W.D. Okla. 2022).

pending charge in Count 2.  Order Setting Conditions of Release, R.64, Page

ID #294; Minute Entry for Status Conference, R.72, Page ID #311.  Given

those limitations on his freedom, the government did not want to

unnecessarily delay this appeal.  Second, this Court can easily determine that

§ 922(g)(8) is facially constitutional without further guidance from the Supreme

Court.[3]  Third, even if the Supreme Court were strike down § 922(g)(8) in

*Rahimi*, Combs could seek appropriate relief at that time.  If his case were still

pending in the district court, he could file a renewed motion to dismiss Count

1.  If his case were on direct appeal, he would be entitled to the benefit of the

Supreme Court's decision.  *See Griffith v. Kentucky*, 479 U.S. 314, 328 (1987).

Thus, prompt resolution of the current appeal in the government's favor would

not prejudice Combs even if the Supreme Court were to subsequently hold

§ 922(g)(8) unconstitutional.

---

[3] If this Court were to hold that § 922(g)(8) is facially constitutional, Combs would not need to petition for a writ of certiorari at that time.  The Supreme Court routinely denies petitions that are in an interlocutory posture. *See* Stephen M. Shapiro et al., Supreme Court Practice § 4.18, at 282-83 & n.72 (10th ed. 2013).  If, on remand, Combs were ultimately convicted and sentenced under § 922(g)(8) and that conviction and sentence were upheld on appeal, he could challenge the constitutionality of § 922(g)(8), together with any other claims that may arise in those further proceedings, in a single petition for a writ of certiorari.  *See Major League Baseball Players Ass'n v. Garvey*, 532 U.S. 504, 508 n.1 (2001) (per curiam).

15

**D.    The Second Amendment allows Congress to disarm persons who are not law-abiding, responsible citizens.**

In *Heller*, the Supreme Court described the right to keep and bear arms as a "right of law-abiding, responsible citizens." *Heller*, 554 U.S. at 635. The Court also made clear that legislatures may adopt categorical prohibitions on the possession of arms by those who are not law-abiding and responsible, identifying "longstanding prohibitions on the possession of firearms by felons and the mentally ill" as "examples" of "presumptively lawful regulatory measures." *Id.* at 626, 627 n.26.

*Bruen* reaffirmed that reading of the Second Amendment. The Court reiterated *Heller*'s holding that the Amendment protects "the right of an ordinary, law-abiding citizen to possess a handgun in the home." *Bruen*, 142 S. Ct. at 2122. And the Court agreed with the plaintiffs in that case that "ordinary, law-abiding citizens have a similar right to carry handguns publicly for their self-defense." *Id.* In all, the Court's opinion used the term "law-abiding, responsible citizens" and its variants more than a dozen times to describe the Amendment's scope.[4]

---

[4] *See Bruen*, 142 S. Ct. at 2125 ("law-abiding, adult citizens"); *id.* at 2131 ("law-abiding, responsible citizens") (quotation marks omitted); *id.* at 2133 ("a law-abiding citizen's right to armed self-defense" and "law-abiding citizens"); *id.* at 2134 ("ordinary, law-abiding, adult citizens"); *id.* at 2135 n.8 ("law-abiding citizens"); *id.* at 2138 ("law-abiding citizens"); *id.* at 2138 n.9 ("'law-

1.    **History confirms the Supreme Court's repeated statements limiting the right to those who are law-abiding and responsible.**

The Second Amendment's history confirms that it does not protect the right of lawbreakers and irresponsible people to possess firearms. *Heller* explained that "the Second Amendment was not intended to lay down a 'novel principl[e]' but rather codified a right 'inherited from our English ancestors.'" *Heller*, 554 U.S. at 599 (quoting *Robertson v. Baldwin*, 165 U.S. 275, 281 (1897)). The 1689 English Bill of Rights, which "has long been understood to be the predecessor to our Second Amendment," *id.* at 593, provided that "the Subjects which are Protestants, may have Arms for their Defence suitable to their Conditions, and as allowed by Law," *id.* (quoting 1 W. & M., ch. 2, § 7, in 3 Eng. Stat. at Large 441). The wording of that provision indicates that Parliament could exclude those who broke the law or whose "[c]onditions" were unsuitable to firearm possession. *See United States v. Jackson*, 69 F.4th 495, 502 (8th Cir. 2023). Thus, when the "Second Amendment . . . codified [the] *pre-existing* right" to bear arms, *Heller*, 554 U.S. at 592, it codified a right

---

abiding, responsible citizens'" and "ordinary citizens") (quotation marks omitted); *id.* at 2149 ("the responsible") (quotation marks omitted); *id.* at 2150 ("law-abiding citizens" and "responsible arms carrying"); *id.* at 2156 ("law-abiding, responsible citizens" and "law-abiding citizens").

that was "not unlimited," *id.* at 626, and was not understood to extend to lawbreakers and the irresponsible.

Precursors to the Second Amendment proposed at the state ratifying conventions also indicate that legislatures can disarm lawbreakers and those who are dangerous. A proposed bill of rights presented at the Pennsylvania ratifying convention stated that "no law shall be passed for disarming the people or any of them unless for crimes committed, or real danger of public injury from individuals." 2 Bernard Schwartz, *The Bill of Rights: A Documentary History* 665 (1971) (emphasis added). The Federalists defeated the proposal, but the Anti-Federalists published it in the Dissent of the Minority of the Convention, *id.* at 624, which was widely read and proved "highly influential" on the Bill of Rights. *Heller*, 554 U.S. at 604.

At the Massachusetts ratifying convention, Samuel Adams similarly proposed a bill of rights that would have denied Congress the power "to prevent the people of the United States, *who are peaceable citizens*, from keeping their own arms." 6 *Documentary History* 1453 (John P. Kaminski & Gaspare J. Saladino eds., 2000) (emphasis added). The convention rejected the proposal, but only because Adams had waited until the morning of the day of ratification to present it. Letter from Jeremy Belknap to Ebenezer Hazard (Feb. 10, 1788),

in 7 *Documentary History* 1583 (John P. Kaminski & Gaspare J. Saladino eds., 2001).

Although those precursors used different language from the Second Amendment, they shed light on the Amendment's meaning. *See Heller*, 554 U.S. at 604. The Amendment codified a "pre-existing," "venerable," and "widely understood" right, making it unlikely that "different people of the founding period had vastly different conceptions" of its scope. *Id.* at 603-05. The precursors discussed above reveal a common conception that the government may disarm those who are not "law-abiding, responsible citizens." *Id.* at 635.

### 2. Individuals subject to domestic-violence protective orders are not responsible.

Individuals subject to the protective orders covered by Section 922(g)(8) pose a grave danger to others. Most obviously, their possession of firearms imperils their intimate partners. "Domestic violence often escalates in severity over time," and "the presence of a firearm increases the likelihood that it will escalate to homicide." *United States v. Castleman*, 572 U.S. 157, 160 (2014). The presence of a gun in a household with a domestic abuser increases the risk of homicide fivefold. Aaron J. Kivisto & Megan Porter, *Firearm Use Increases Risk of Multiple Victims in Domestic Homicides*, 48 J. Am. Acad. Psychiatry L. 26, 26 (2020). And domestic assaults with guns are around 12 times likelier to

19

cause death than assaults without guns.  *See* Anthony A. Braga et al., *Firearm Instrumentality: Do Guns Make Violent Situations More Lethal*, 2021 Ann. Rev. Criminology 147, 153.

Armed domestic abusers pose additional dangers.  Abusers often use guns to intimidate their partners—for instance, by brandishing or firing guns during arguments.  *See* Nat'l Inst. of Justice, Office of Justice Programs, U.S. Dep't of Justice, *Special Report*, *Practical Implications of Current Domestic Violence Research: For Law Enforcement, Prosecutors and Judges* 26 (June 2009), available at https://www.ojp.gov/pdffiles1/nij/225722.pdf.  Those concerns apply with particular force to cases involving protective orders.  Victims who seek judicial protection are likely to have experienced especially severe abuse.  *See* TK Logan et al., *Relationship Characteristics and Protective Orders Among a Diverse Sample of Women*, 22 J. Fam. Violence 237, 241 (2007).  They are likelier than other victims to report that their abusers used guns to threaten, pistol-whip, or shoot them.  *See* Kellie R. Lynch et al., *Firearm-related Abuse and Protective Order Requests Among Intimate Partner Violence Victims*, 37 J. Interp. Violence 12,974, 12,984 (2021).

Nor does the entry of a protective order guarantee the end of the abuse. Domestic abuse has a high recidivism rate, *see United States v. Skoien*, 614 F.3d 638, 644 (7th Cir. 2010), and abusers often persist in their abuse despite

protective orders, *see* Reinie Cordier et al., *The Effectiveness of Protection Orders in Reducing Recidivism in Domestic Violence: A Systematic Review and Meta-Analysis*, 22 Trauma, Violence, & Abuse 804, 825 (2021).  A victim's decision to obtain an order can even prompt violent retaliation.  *See* Tom Lininger, *A Better Way to Disarm Batterers*, 54 Hast. L.J. 525, 567 (Mar. 2003).

Armed domestic abusers also endanger people other than their partners. In around a quarter of the cases where an abuser killed an intimate partner, the abuser also killed someone else, such as a child, family member, or roommate—either because those people tried to intervene or were simply bystanders.  *See* Sharon G. Smith et al., *Intimate Partner Homicide and Corollary Victims in 16 States: National Violent Death Reporting System, 2003-2009*, 104 Am. J. Pub. Health 461, 463-64 (Mar. 2014).  Armed domestic abusers endanger the police, as one study found that domestic disputes were "the most dangerous type of call for responding officers" and caused more officer deaths in the line of duty than any other type of call.  Nick Bruel & Mike Keith, *Deadly Calls and Fatal Encounters: Analysis of U.S. law enforcement line of duty deaths when officers responded to dispatched calls for service and conducted enforcement, 2010-2014*, at 15 (2016).  And armed domestic abusers endanger the public at large.  In more than two-thirds of the mass shootings that occurred from 2014 to 2019, the shooter either had a history of domestic violence or fired at a

partner or family member as part of the shooting.  Lisa B. Geller et al., *The role of domestic violence in fatal mass shootings in the United States, 2014-2019*, 8 Injury Epidemiology 38, at 5 (2021).  In sum, Combs and other persons subject to protective orders fall squarely within the category of irresponsible individuals whom the Second Amendment has always allowed Congress to disarm.

### E.    Section 922(g)(8) is consistent with the historical tradition of disarming dangerous people.

Section 922(g)(8)'s prohibition on firearm possession by those subject to domestic-violence restraining orders is also consistent with the long American tradition of disarming those who pose a danger to others or to society.

### 1.    There is a well-established historical tradition of disarming those likely to present a danger to themselves or others.

There is widespread agreement among courts and commentators that disarming dangerous people is consistent with the American tradition.  Some judges and commentators have incorrectly maintained that *only* dangerous people may be disarmed—and that, for example, non-dangerous felons cannot be disarmed.  *See, e.g., Kanter v. Barr*, 919 F.3d 437, 451-64 (7th Cir. 2019) (Barrett, J., dissenting); Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 Wyo. L. Rev. 249, 257-67, 285-86 (2020).  But even these judges and commentators agree that "[h]istory . . . demonstrates that legislatures have the power to prohibit dangerous people

from possessing guns." *Kanter*, 919 F.3d at 451 (Barrett, J., dissenting); *see Binderup v. Attorney General*, 836 F.3d 336, 368-69 (3d Cir. 2016) (en banc) (Hardiman, J., concurring in part and concurring in the judgments) ("[T]he best evidence we have indicates that the right to keep and bear arms was understood to exclude those who presented a danger to the public."); *Folajtar v. Attorney General*, 980 F.3d 897, 914 (3d Cir. 2020) (Bibas, J., dissenting) ("English and early American laws disarmed the dangerous." (italics omitted)); Greenlee, 20 Wyo. L. Rev. at 272 (observing that in "each [relevant] historical period," "violent or otherwise dangerous persons could be disarmed").

This scholarly consensus is supported by ample historical evidence from English history, colonial American history, and the period after the founding.

### i.    English History

The Second Amendment "was not intended to lay down a 'novel principl[e]' but rather codified a right 'inherited from our English ancestors.'" *Heller*, 554 U.S. at 599.  And the English right was not understood to prevent the disarming of dangerous people.  In England, the 1662 Militia Act empowered the government to "seize all arms in the custody or possession of any person" who was "judge[d] dangerous to the Peace of the Kingdom." Militia Act 1662, 13 & 14 Car. 2, c. 3, § 13.  Parliament subsequently recognized a legal right to possess arms in the Bill of Rights, which protected

the right of Protestants to "have Arms for their Defence suitable to their Conditions and as allowed by Law."  1 W. & M. Sess. II, c. 2 (1688) (Eng.).

While condemning the disarming of "good subjects," 1 W. & M. Sess. II, c. 2, the English Bill of Rights allowed the disarming of irresponsible or dangerous ones.  It did not displace the 1662 Militia Act, the use of which "continued unabated" after the adoption of the English Bill of Rights. Diarmuid F. O'Scannlain, *Glorious Revolution to American Revolution: The English Origin of the Right to Keep and Bear Arms*, 95 Notre Dame L. Rev. 397, 405 (2019).[5]  Indeed, many 18th-century justice-of-the-peace manuals recognized that the Militia Act authorized local officials to disarm those they "judge[d] dangerous."[6]

---

[5] *See, e.g.*, *Calendar of State Papers, Domestic Series, Of the Reign of William III, 1 April, 1700–8 March, 1702*, at 234 (Feb. 26, 1701) (Edward Bateson ed., 1937) (instructions to disarm "dangerous" persons); Privy Council to the Earl of Carlisle (July 30, 1714), *in* Historical Manuscripts Commission, *Tenth Report, Appendix, Part IV* 343 (1885) (similar); Lord Lonsdale to Deputy Lieutenants of Cumberland (May 20, 1722), *in* Historical Manuscripts Commission, *Fifteenth Report, Appendix, Part VI* 39-40 (1897) (similar); Order of Council to Lord Lieutenants (Sept. 5, 1745), *in* Historical Manuscripts Commission, *Report on the Manuscripts of the Marquess of Lothian, Preserved at Blickling Hall, Norfolk* 148 (1905) (similar).

[6] Robert Gardiner, *The Compleat Constable* 68 (3d ed. 1708); *see, e.g.*, Giles Jacob, *The Modern Justice* 338 (1716); W. Nelson, *The Office and Authority of a Justice of Peace* 464 (7th ed. 1721); G. Jacob, *Lex Constitutionis* 331 (2d ed. 1737); Theodore Barlow, *The Justice of Peace* 367 (1745); 2 Joseph Shaw, *The Practical Justice of Peace, and Parish and Ward-Officer* 231 (6th ed. 1756).

Similarly, the Statute of Northampton made the offense of "rid[ing]" or "go[ing] armed" punishable by forfeiture of the offender's "armor."  2 Edw. 3, c. 3 (1328) (Eng.); *see Bruen*, 142 S. Ct. at 2139-42.  Leading 18th-century scholars agreed that the Statute forbade carrying weapons in a terrifying manner, and that it made violations punishable by forfeiture of the weapons.[7] And, even at the time of the American Revolution, the English Bill of Rights was understood to allow disarming irresponsible and non-peaceable subjects. In 1780, after London officials responded to widespread rioting by confiscating rioters' arms, the House of Lords debated—and rejected—a motion declaring that the confiscation violated the English Bill of Rights.  Joyce Lee Malcolm, *To Keep and Bear Arms: The Origins of an Anglo-American Right* 130-32 (1994). Because the English right "has long been understood to be the predecessor to our Second Amendment," *Heller*, 554 U.S. at 593, this history indicates that the Second Amendment likewise allows Congress to disarm those who are not law-abiding, responsible citizens.

---

[7] *See, e.g.*, 4 William Blackstone, *Commentaries on the Laws of England* 149 (10th ed. 1787); 1 Richard Burn, *The Justice of the Peace, and Parish Officer* 13-14 (2d ed. 1756); 1 William Hawkins, *A Treatise of the Pleas of the Crown* 135 (1716).

###### ii.    Early American History

American colonies—and later states—also quickly developed a tradition of disarming those who were considered dangerous.  Early American justice-of-the-peace manuals explained that the Statute of Northampton—which the colonies inherited along with other pre-colonization statutes, *see Patterson v. Winn*, 30 U.S. (5 Pet.) 233, 241 (1831)—empowered justices of the peace to confiscate the arms of persons who carried them in a manner that spread fear or terror.[8]  Some 17th- and 18th-century American statutes expressly recodified that rule.[9] Others made forfeiture part of the penalty for offenses such as unsafe storage of guns or gunpowder.[10] Although those laws involved forfeiture of

---

[8] *See, e.g.*, James Davis, *The Office and Authority of a Justice of Peace* 5 (1774) (N.C.); Joseph Greenleaf, *An Abridgment of Burn's Justice of the Peace and Parish Officer* 12-13 (1773) (Mass.); William Waller Hening, *The New Virginia Justice* 18 (1795) (Va.); Eliphalet Ladd, *Burn's Abridgement, Or The American Justice* 22-24 (2d ed. 1792) (N.H.); James Parker, *Conductor Generalis* 12 (1764) (N.J.); James Parker, *Conductor Generalis* 12 (Robert Hodge printing 1788) (N.Y.); James Parker, *Conductor Generalis* 11 (Robert Campbell printing 1792) (Pa.).

[9] *See* Act of Nov. 1, 1692, ch. 18, § 6, 1 *Acts and Resolves of the Province of Massachusetts Bay* 52-53 (1869); Act of June 14, 1701, ch. 7, 1 *Laws of New Hampshire* 679 (Albert Stillman Batchellor ed., 1904); Act of Nov. 27, 1786, ch. 21, *A Collection of all such Acts of the General Assembly of Virginia, of a Public and Permanent Nature, as are now in Force* 33 (1794).

[10] *See* Act of Mar. 1, 1783, ch. 46, 1782-83 Mass. Acts 120 (1890); Act of Feb. 18, 1794, § 1, *The Laws of the State of New Hampshire* 460 (1815); Ordinance of Oct. 9, 1652, *Laws and Ordinances of New Netherland, 1638-1674*, at 138 (E.B. O'Callaghan ed., 1868); Act of Mar. 15, 1788, ch. 81, § 1, 2 *Laws of the State of*

arms involved in an offense, rather than bans on possessing arms, they show that legislatures could restrict an individual's ability to bear arms if his conduct suggested that his possession of firearms would endanger others.

Additionally, the American colonies carried over the English common-law surety practice, designed to protect those who faced a threat of harm. As Blackstone explained it, whenever "any private man ha[d] just cause to fear, that another w[ould] burn his house, or do him a corporal injury, by killing, imprisoning, or beating him," the threatened person could "demand surety of the peace against such person." 4 William Blackstone, *Commentaries on the Laws of England* 252 (1769). If the threatening person failed to find sureties, he could be immediately committed to jail. *Id.*

Several American jurisdictions expressly codified this surety system. Two of the colonies that codified the Statute of Northampton (Massachusetts Bay and New Hampshire) passed laws requiring those who went "armed offensively" to obtain sureties of the peace or of good behavior.[11] And, by

_____

*New-York*, 95-96 (2d ed. 1807); Act of Dec. 6, 1783, ch. 1059, § 1, 11 *The Statutes at Large of Pennsylvania from 1682 to 1801*, at 209-10 (1906).

[11] 1 Act of Nov. 1, 1692, ch. 18, § 6, 1 *Acts and Resolves of the Province of Massachusetts Bay* 52-53 (1869); Act of June 14, 1701, ch. 7, 1 *Laws of New Hampshire* 679 (Albert Stillman Batchellor ed., 1904).

27

1791, at least five additional jurisdictions had codified or presumed the availability of the common-law surety system.[12]

### iii.    Post-Founding

Post-ratification commentators and legislation confirm that the Second Amendment allows disarming the dangerous.  One legal scholar observed that the Second Amendment should not be "abused to the disturbance of the public peace" and allowed restricting a person's right to carry firearms where there was "just reason to fear that he purposes to make an unlawful use of them." William Rawle, *A View of the Constitution of the United States of America* 126 (2d ed. 1829).  Another scholar interpreted the Second Amendment and its state counterpart to mean that a "free citizen, if he demeans himself peaceably, is not to be disarmed."  John Holmes, *The Statesman, or Principles of Legislation and Law* 186 (1840) (emphasis added).  A state convention in Rhode Island resolved that the Second Amendment forbade "taking from peaceable citizens

---

[12] *See* 2 *Statutes at Large of Pennsylvania from 1682 to 1801*, pg. 23 (1896) (1700 law); 1 *Laws of the State of Delaware from the Fourteenth Day of October, One Thousand Seven Hundred, to the Eighteenth Day of August, One Thousand Seven Hundred and Ninety-Seven* 52 (1797) (1700 law); *Acts and Laws of His Majesties Colony of Connecticut in New-England* 91 (1901) (1702 law); 1 *General Public Statutory Law and Public Local Law of the State of Maryland, from the Year 1692 to 1839 Inclusive: With Annotations Thereto, and a Copious Index,* pg. xxx (1840) (1776 Declaration of Rights); 13 *Statutes at Large; Being a Collection of All the Laws of Virginia, from the first Session of the Legislature, in the Year 1619*, pg. 41 (1823) (1789 law).

their arms." *State Convention of the Suffrage men of Rhode Island*, Vermont Gazette, Dec. 13, 1842, at 1. And a mayor of Washington, D.C., recognized the right of a "peaceable citizen" to bear arms, but asked rhetorically, "why should not the lawless ruffian be disarmed and deprived of the power of executing the promptings of his depraved passions?" Joseph Gales, *Prevention of Crime*, *in* O.H. Smith, *Early Indiana Trials and Sketches* 466-67 (1858).

In the 1840s, states began to adopt surety statutes that required certain potentially irresponsible individuals who carried firearms to post bond. *See Bruen*, 142 S. Ct. at 2148. The earliest such statute, enacted by Massachusetts, required a gun owner to post bond if his conduct created "reasonable cause to fear an injury, or breach of the peace," and if he lacked a special need for self-defense. Mass. Rev. Stat. ch. 134, § 16 (1836). At least nine other jurisdictions adopted variants of that law later in the 19th century. *See Bruen*, 142 S. Ct. at 2148 n.23 (collecting statutes).

As the 19th century wore on, guns became more lethal and more widely available. Guns in the 18th century generally fired only one shot, often misfired, took a long time to load, and could not be kept loaded for long periods. Randolph Roth, *Why Guns Are and Are Not the Problem*, *in* Jennifer Tucker et al. eds., *A Right to Bear Arms?: The Contested Role of History in Contemporary Debates on the Second Amendment* 117 (2019). But technological

developments in the 1800s—such as metallic cartridges; cheap, mass-produced revolvers; and guns capable of firing multiple shots—led to the increased use of guns in homicides. *Id.* at 123-27. During this time, legislatures disarmed a range of individuals whom they deemed unfit to carry firearms, including those below certain ages,[13] those of unsound mind,[14] vagrants,[15] and

---

[13] *See* Act of July 13, 1892, ch. 159, § 5, 27 Stat. 117 (D.C.); Act of Feb. 2, 1856, No. 26, § 1, 1856 Ala. Acts 17; Act of Apr. 8, 1881, ch. 548, § 1, 16 Del. Laws 716 (1881); Act of Feb. 4, 1881, ch. 3285, No. 67, § 1, 1881 Fla. Laws 87; Act of Feb. 17, 1876, No. 128, § 1, 1876 Ga. Laws 112; Act of Apr. 16, 1881, § 2, 1881 Ill. Laws 73; Act of Feb. 27, 1875, ch. 40, § 1, 1875 Ind. Laws 59; Act of Mar. 29, 1884, ch. 78, § 1, 1884 Iowa Acts 86; Act of Mar. 5, 1883, ch. 105, § 1, 1883 Kan. Sess. Laws 159; Ky. Gen. Stat. ch. 29, Art. 29, § 1, at 359 (Edward I. Bullock & William Johnson eds., 1873); Act of July 1, 1890, No. 46, § 1, 1890 La. Acts 39; Act of May 3, 1882, ch. 424, § 2, 1882 Md. Laws 656; Act of June 2, 1883, No. 138, § 1, 1883 Mich. Pub. Acts 144; Act of Feb. 28, 1878, ch. 46, § 2, 1878 Miss. Laws 175; 1 Mo. Rev. Stat. ch. 24, Art. II, § 1274, at 224 (1879); Act of Mar. 2, 1885, ch. 51, § 1, 1885 Nev. Stat. 51; Act of Feb. 10, 1882, ch. 4, §§ 1-2, 1882 N.J. Acts 13-14; Act of May 10, 1883, § 1, ch. 375, 1883 N.Y. Laws 556; Act of Mar. 6, 1893, ch. 514, § 1, 1893 N.C. Pub. Laws 468; Act of Mar. 25, 1880, § 1, 1880 Ohio Laws 79-80; Act of June 10, 1881, § 1, 1881 Pa. Laws 111-12; Act of Apr. 13, 1883, ch. 374, § 1, 1883 R.I. Acts & Resolves 157; Act of Feb. 26, 1856, ch. 81, § 2, 1856 Tenn. Acts 92; Act of 1897, ch. 155, § 1, 1897 Tex. Gen. Laws 221; Act of Nov. 16, 1896, No. 111, § 1, 1896 Vt. Acts & Resolves 83; Act of Nov. 26, 1883, § 1, 1883 Laws of the Territory of Wash. 67; Act of Mar. 29, 1882, ch. 135, § 1, 1882 W. Va. Acts 421; Act of Apr. 3, 1883, ch. 329, § 2, 1883 Wis. Sess. Laws, Vol. 1, at 290; Act of Mar. 14, 1890, ch. 73, § 97, 1890 Wyo. Territory Sess. Laws 140.

[14] *See* Act of Feb. 4, 1881, ch. 3285, No. 67, § 1, 1881 Fla. Laws 87; Act of Mar. 5, 1883, ch. 105, § 1, 1883 Kan. Sess. Laws 159; Act of Feb. 17, 1899, ch. 1, § 52, 1899 N.C. Pub. Laws 20-21.

[15] *See* Act of Mar. 27, 1879, ch. 59, § 4, 1879 Conn. Pub. Acts 394; Act of

intoxicated persons.[16]

State courts upheld such laws on the ground that the disqualified individuals were apt to use arms irresponsibly. The Missouri Supreme Court, for example, upheld a ban on carrying arms while intoxicated as a "reasonable regulation" that prevented the "mischief to be apprehended from an intoxicated person going abroad with fire-arms." *State v. Shelby*, 2 S.W. 468, 469 (Mo. 1886). And the Ohio Supreme Court explained that a law disarming "tramps" was consistent with the right to keep and bear arms because that right "was never intended as a warrant for vicious persons to carry weapons with which to terrorize others." *State v. Hogan*, 58 N.E. 572, 575 (Ohio 1900).

---

Mar. 27, 1879, ch. 155, § 8, 16 Del. Laws 225 (1879); Act of May 3, 1890, ch. 43, § 4, 1890 Iowa Acts 69; Act of Apr. 24, 1880, ch. 257, § 4, 1880 Mass. Acts 232; Miss. Rev. Code ch. 77, § 2964 (1880); Act of Aug. 1, 1878, ch. 38, § 2, 1878 N.H. Laws 170; Act of May 5, 1880, ch. 176, § 4, 1880 N.Y. Laws, Vol. 2, at 297; Act of Mar. 12, 1879, ch. 198, § 2, 1879 N.C. Sess. Laws 355; Act of June 12, 1879, § 2, 1879 Ohio Laws 192; Act of Apr. 30, 1879, § 2, 1879 Pa. Laws 34; Act of Apr. 9, 1880, ch. 806, § 3, 1880 R.I. Acts & Resolves 110; Act of Nov. 26, 1878, No. 14, § 3, 1878 Vt. Acts & Resolves 30; Act of Mar. 4, 1879, ch. 188, § 4, 1879 Wis. Sess. Laws 274.

[16] *See* Act of Feb. 23, 1867, ch. 12, § 1, 1867 Kan. Sess. Laws 25; Act of Feb. 28, 1878, ch. 46, § 2, 1878 Miss. Laws 175; 1 Mo. Rev. Stat. ch. 24, Art. II, § 1274, at 224 (1879).

## 2.    Section 922(g)(8) is consistent with this tradition.

Section 922(g)(8) fits squarely within this longstanding tradition.  Like the historical laws discussed above, § 922(g)(8) disarms those who pose a danger to others.  Section 922(g)(8) applies only if the restraining order either (1) includes a finding that the individual poses a "credible threat to the physical safety" of an intimate partner or child or (2) expressly prohibits the "use, attempted use, or threatened use of physical force" against the intimate partner or child.  18 U.S.C. § 922(g)(8)(C).  Everyone who satisfies the first criterion, by definition, poses a danger to others.  In adopting the second criterion, Congress reasonably concluded that courts would specifically prohibit the use, attempted use, or threatened use of force only if "evidence credited by the court reflected a real threat or danger of injury to the protected party." *Emerson*, 270 F.3d at 262.  And, as explained above, empirical evidence demonstrates that those subject to domestic violence restraining orders pose a danger to their intimate partners and others if armed.  Thus, § 922(g)(8) is consistent with the historical tradition of disarming the potentially dangerous.

It does not matter that these historical laws did not specifically target those who threatened intimate partners or who were subject to civil restraining orders.  The Supreme Court has made clear that a modern regulation can comply with the Second Amendment even if it lacks "a historical twin."

32

*Bruen*, 142 S. Ct. at 2133 (emphasis omitted). For example, the Amendment allows Congress to disarm felons, *see Heller*, 554 U.S. at 626, even though the first federal law disarming felons dates to 1938, *see* Federal Firearms Act, ch. 850, § 2(d)-(f ), 52 Stat. 1251. And although "the historical record yields relatively few 18th- and 19th-century 'sensitive places'"—for example, "legislative assemblies, polling places, and courthouses"—the Amendment allows "modern regulations prohibiting the carry of firearms in *new* and analogous sensitive places." *Bruen*, 142 S. Ct. at 2133. Relatedly, the Court has dismissed, as "bordering on the frivolous," the argument that the Amendment protects "only those arms in existence in the 18th century." *Heller*, 554 U.S. at 582. The notion that the Amendment permits only those regulations that existed in the 18th century has no more merit. *Cf. McIntyre v. Ohio Elections Commission*, 514 U.S. 334, 373 (1995) (Scalia, J., dissenting) ("Quite obviously, not every restriction upon expression that did not exist in 1791 or 1868 is *ipso facto* unconstitutional.").

Past legislatures may have declined to enact a law exactly like § 922(g)(8) for a variety of reasons. As an initial matter, past generations could not have disarmed persons subject to protective orders because such orders did not exist. For much of the Nation's history, the common-law doctrine of interspousal tort immunity precluded courts from hearing abused wives' civil suits against

their husbands. *See Thompson v. Thompson*, 218 U.S. 611, 618 (1910); Reva B.

Siegel, *"The Rule of Love": Wife Beating as Prerogative and Privacy*, 105 Yale L.J.

2117, 2161-70 (1996).

Additionally, past legislatures may have assumed that protections such

as the common-law surety system or criminal laws against assault were

sufficient to prevent spousal violence. As America's first family law treatise

explained, a husband or wife's "violation of each other's rights, by an

unjustifiable violence, is a breach of the laws of society, for which they are

liable *criminaliter*." *See* Tapping Reeve, *The Law of Baron and Femme; of Parent

and Child; of Guardian and Ward; of Master and Servant; and of the Powers of Courts

of Chancery* 65 (New Haven, Oliver Steele 1816). And, the treatise explained, a

husband or wife "may institute a process against each other, the object of

which is to compel them to find securities for their good behaviour." *Id.* at 65-

66; *see State v. Davis*, 5 S.C.L. (3 Brev.) 3, 4 (S.C. Const. Ct. App. 1811) ("It is

clear that a wife may demand sureties of the peace against her husband, and so

may her husband against her."). The assumption that other laws would

adequately address spousal violence is particularly likely given that "[f]amily

and intimate homicides were extremely rare" in colonial America. Randolph

Roth, *American Homicide* 108 (2009).

Moreover, because of technological differences, the combination of firearms and domestic strife did not pose the same threat in the past that it poses today. Because guns in the 18th century had a variety of technological limitations, *see supra*, pages 29-30, household homicides in colonial times were only rarely committed with guns, Roth, *supra*, *Why Guns Are and Are Not the Problem* at 108, 116-17. But later technological developments—such as metallic cartridges; cheap, mass-produced revolvers; and guns capable of firing multiple shots—have led to the increased use of guns in homicides, including domestic homicides. *See id.* at 123-27. Now, more than half of the women who are killed by their intimate partners are killed with guns. *See* Violence Policy Center, *When Men Murder Women: An Analysis of 2018 Homicide Data* 5 (Sept. 2020). *Bruen* recognized that "[t]he regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders" and that the Second Amendment does not prevent Congress from adopting new laws to respond to "unprecedented societal concerns or dramatic technological changes." *Bruen*, 142 S. Ct. at 2132. Thus, § 922(g)(8) is consistent with the historical tradition even though it does not burden firearm possession in precisely the same way or for precisely the same reasons as founding-era laws.

### F.    The district court's contrary decision was error.

The district court committed several errors in holding that § 922(g)(8) is unconstitutional.  It incorrectly concluded that the government had waived certain arguments by failing to object to the favorable report and recommendation.  It wrongly concluded that the Second Amendment protects the right of irresponsible people to possess firearms.  And, in considering the historical tradition of firearm regulation, it demanded something far too close to a "historical twin."

### 1.    The government did not waive any arguments by failing to object to the favorable report and recommendation.

The district court wrongly concluded that the government failed to preserve the argument that the Second Amendment protects only the right of "law-abiding, responsible citizens" to bear firearms.  *See* R.33, Page ID #136-37.  True, the government did not object to the report and recommendation's conclusion that "the plain text of the Second Amendment is not limited only to law-abiding citizens."  R.27, Page ID #104.  But that is because the magistrate judge recommended denying Combs's motion to dismiss on the alternative ground that "§ 922(g)(8) is consistent with this Nation's historical tradition of firearm regulation."  R.27, Page ID #118.

"A party may forfeit its ability to raise an issue that the magistrate judge has rejected if the party did not timely object to the magistrate judge's findings

and recommendations." *Gerth v. Warden, Allen Oakwood Corr. Inst.*, 938 F.3d 821, 827 (6th Cir. 2019); *see* Fed. R. Crim. P. 59(b)(2) ("Failure to object in accordance with this rule waives a party's right to review."). But a party that "substantially prevails in a magistrate judge's recommendation[] does not waive the right to appeal secondary issues resolved against [it] by failing to object to the recommendation." *Souter v. Jones*, 395 F.3d 577, 586 (6th Cir. 2005). As this Court has explained, requiring a party "to present objections to a magistrate judge's proposed adverse resolution of a secondary issue" would "only frustrate the judicial economy and litigant expense policies" that underlie the forfeiture rule. *Turpin v. Kassulke*, 26 F.3d 1392, 1400 (6th Cir. 1994); *see Marsalis v. Pennsylvania Dep't of Corr.*, 37 F.4th 885, 888 (3d Cir. 2022) (observing that requiring "a *prevailing* party to object to a report in its favor to preserve alternative grounds for winning" would be "wasteful"). Therefore, the government had no obligation to object to the magistrate judge's conclusion that the Second Amendment's protections extend beyond "law-abiding citizens." R.27, Page ID #104.

Similarly, the district court erred by suggesting that the government "waived" its reliance on any "historical laws other than surety statutes" by "fail[ing] to timely object" to the report and recommendation. R.33, Page ID #140. The magistrate judge believed that the surety laws were sufficient to

37

sustain § 922(g)(8) and therefore did not address other historical laws cited by the government.  R.27, Page ID #109-14.  The fact that the magistrate judge failed to cite additional support for this conclusion provided no basis for the government to object to the favorable decision.  As the Third Circuit has concluded, "a prevailing party need not object to a magistrate judge's report and recommendation to preserve arguments that the magistrate judge did not address."  *Marsalis*, 37 F.4th at 888.  Thus, contrary to the district court's suggestion, the government's failure to object to the favorable report and recommendation did not waive or forfeit the arguments that the Second Amendment protects only "law-abiding, responsible citizens" and that additional historical laws (beyond surety statutes) support § 922(g)(8).

> **2.    The district court wrongly concluded that the Second Amendment protects the non-law-abiding and irresponsible.**

As explained above, both Supreme Court precedent and the historical record demonstrate that the Second Amendment protects only "law-abiding, responsible citizens."  The district court dismissed *Heller*'s and *Bruen*'s repeated use of that term on the basis that "[t]he issue of whether a non-law-abiding citizen qualifies for Second Amendment protection was not before the [Supreme] Court."  R.33, Page ID #136 (quoting *United States v. Goins*, No. 5:22-CR-91, 2022 WL 17836677 (E.D. Ky. Dec. 21, 2022)).  But the district

court failed to grapple with the Supreme Court's consistent use of that term when describing the "right" protected by the Second Amendment.

Additionally, the district court wrongly understood the government's argument to be that those subject to domestic-violence restraining orders are not part of "the people" under the Second Amendment. *See* R.33, Page ID #135-36. The government never made that argument. *See* United States's Response to Defendant's Motion to Dismiss Indictment, R.25, Page ID #65-69. Instead, the government argued that even members of the "national community" can be stripped of their right to possess firearms where their conduct shows that they are neither law-abiding nor responsible. R.33, Page ID #135 (quoting *Heller*, 554 U.S. at 580). For the reasons given above, this Court should conclude that those subject to domestic-violence restraining orders are not protected by the Second Amendment's text, as historically understood.

### 3. The court improperly demanded a "historical twin."

Finally, the district court erred in concluding that § 922(g)(8) is inconsistent with American's historical tradition of firearm regulation. The government explained below that a variety of historical sources—including the ratification debates, surety laws, laws punishing carrying firearms to the "terror of the people," laws disarming loyalists who refused to swear loyalty, and

other laws disarming dangerous people—supported § 922(g)(8)'s constitutionality.  R.25, Page ID #69-76.  The government explained how these historical laws are analogous to § 922(g)(8), R.25, Page ID #75-76, as did the magistrate judge with respect to surety laws, R.27, Page ID #109-14.

In rejecting these historical analogies, the district court effectively required a "dead ringer" or "historical twin." *Bruen*, 142 S. Ct. at 2133 (emphasis omitted).  The court distinguished historical surety statutes on the basis that they allowed an accused person to carry arms if he "either show[ed] a need for self-defense or post[ed] a bond," whereas § 922(g)(8) restricts firearm possession for the duration of the restraining order.  R.33, Page ID #139.  And it distinguished historical loyalty-oath laws on the bases that (a) loyalists could regain their right to possess firearms by swearing to obey the law and (b) the laws were designed to deal with "the potential threat coming from armed citizens who remained loyal to another sovereign."  R.33, Page ID #141 (quotation marks omitted) (quoting *Kanter*, 919 F.3d at 457 (Barrett, J., dissenting)).

The district court erred by focusing on these superficial distinctions while ignoring important similarities.  Like surety statutes, § 922(g)(8) burdens the firearm possession of those who present a credible threat to others—with the aim of protecting individuals (and society) from dangerous people.  Like

40

loyalty oath laws, § 922(g)(8) is designed to ensure that people who cannot be trusted with firearms are disarmed during the duration of their untrustworthiness. And, just as a person subject to surety or loyalty-oath laws could regain firearm possession by posting a bond or swearing an oath of allegiance, R.33, Page ID #139, 141, a person subject to a protective order can seek to terminate the order by showing that he no longer presents a threat to his intimate partner or child. The district court improperly discounted these similarities.

It does not matter that the loyalty-oath laws focused on the "threat" from those "loyal to another sovereign." R.33, Page ID #141 (quotation marks omitted). The relevant question is not whether the modern and historical laws respond to identical threats, but whether they impose a "comparable burden" that is "comparably justified." *Bruen*, 142 S. Ct. at 2133. Both § 922(g)(8) and the loyalty oath laws are aimed at potentially dangerous people; the exact reason for the danger does not matter. Accordingly, the district court erred in concluding that § 922(g)(8) is inconsistent with the historical tradition of firearm regulation.

## CONCLUSION

This Court should reverse the district court's order dismissing Count 1 of the indictment.

Respectfully submitted,

CARLTON S. SHIER, IV
United States Attorney

NICOLE M. ARGENTIERI
Acting Assistant Attorney General

CHARLES P. WISDOM, JR.
Assistant United States Attorney
Eastern District of Kentucky

LISA H. MILLER
Deputy Assistant Attorney General

s/William A. Glaser
WILLIAM A. GLASER
Attorney, Appellate Section
Criminal Division
U.S. Department of Justice
950 Pennsylvania Ave, NW, Ste. 1264
Washington, DC 20530
(202) 532-4495
William.Glaser@usdoj.gov

## CERTIFICATE OF COMPLIANCE

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 9,725 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in Calisto MT 14-point type.

s/William A. Glaser
WILLIAM A. GLASER

## CERTIFICATE OF SERVICE

I hereby certify that on October 23, 2023, I electronically filed the foregoing document with the United States Court of Appeals for the Sixth Circuit using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

s/William A. Glaser
William A. Glaser

## DESIGNATION OF DISTRICT COURT RECORD

| Record Entry | Description | Page ID # |
|---|---|---|
| R.1-1 | Affidavit in Support of Application for a Criminal Complaint | 2-5 |
| R.5 | Indictment | 10-12 |
| R.23-1 | Memorandum of Law in Support of Motion to Dismiss | 52-59 |
| R.25 | United States's Response to Defendant's Motion to Dismiss Indictment | 63-85 |
| R.27 | Report & Recommendation | 100-119 |
| R.33 | Memorandum Opinion and Order | 131-143 |
| R.35 | Notice of Appeal | 145-146 |
| R.64 | Order Setting Conditions of Release | 293-296 |
| R.72 | Minute Entry for Status Conference | 311 |