No. 23-5121

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

---

UNITED STATES OF AMERICA,
Plaintiff/Appellant,

v.

SHERMAN KELVIN COMBS,
Defendant/Appellee.

---

On Appeal from the United States District Court
for the Eastern District of Kentucky, No. 5:22-CR-136
(Hon. Danny C. Reeves)

---

**BRIEF FOR APPELLEE SHERMAN KELVIN COMBS**

---

THOMAS C. LYONS
Attorney for Sherman Kelvin Combs
201 W. Short. St., Ste. 800
Lexington, KY 40507
(859) 231-0055
thomaslyons@hotmail.com

**TABLE OF CONTENTS**

TABLE OF CONTENTS …………………………………………………………..i

TABLE OF AUTHORITIES …………………………………………………....iii

STATEMENT CONCERNING ORAL ARGUMENT……………………………..1

SUMMARY OF ARGUMENT ………………………………………………………1

ARGUMENT …………………………………………………………………...3

    1.  The Court should not hold this case in abeyance pending *Rahimi*………3

    2.  Section 922(g)(8)'s prohibited conduct is protected by the Second Amendment …………………………………...…………………………4

        A.   *Heller* was clear that the Second Amendment protects the right of "the people." ………………………..…………………4

        B.   Adopting the Government's "law-abiding, responsible citizens" limitation is to reject *Bruen's* "rights-protective" analysis….…..7

        C.   *Bruen Bruen* focuses on conduct, and the conduct prohibited by § 922(g)(8) is protected by the Second Amendment ………..…9

    3.  The district court correctly concluded that the government failed to proffer a proper historical analogue § 922(g)(8) ………………………10

        A.   The criminalization of domestic violence is far from a "modern sensibility."……………………………………………….……..13

        B.   The government's dangerousness standard colors outside the lines of *Bruen*……………………………………………..…..15

            i.   English history supports that dangerousness was considered a *political* categorization……………..………17

ii.    Dangerous individuals in early America consisted of (1) political dissidents and (2) those who offensively misused their firearm and were convicted of doing so…………………………………...……………....….20

iii.    The post-founding surety statutes demonstrate that even those found to be a "threat" still could enjoy their right to keep and bear arms………………………………...……...26

CONCLUSION……………………………………………………………...30

# TABLE OF AUTHORITIES

C**ASES**

*Bradley v. State*, 1 Miss. 157 (1824)……………………………………………14

*Commonwealth v. Blanding,* 20 Mass. (3 Pick.) 304, 314 (1825)………………..22

*District of Columbia v. Heller,* 554 U.S. 570 (2008)…………………………passim

*Felton v. Felton,* 679 N.E.2d 672 (Ohio. 1997)…………………………………...16

*Foote v. State,* 59 Md. 264 (1883)…………………………………………....…15

*Grover v. Bullock,* No. 185 (Worcester Cty., Aug. 13, 1853)……………………..29

*Ingram v. Wayne County, Michigan,* 81 F.4th 603 (6th Cir. 2023)…………………7

*Kingrey v. Whitlow,* 150 S.W.3d 67 (Ky.Ct.App. 2004)…………………………...28

*McDonald v. City of Chicago* 561 U.S. 742 (2010)………………………….……..5

*New York State Rifle & Pistol Ass'n v. Bruen,* 142 S.Ct. 2111 (2022)………..passim

*Odden v. Rath*, 730 N.W.2d 590 (N.D. 2007)…………………………………….....16

*Powell v. State of Texas,* 392 U.S. 514 (1968)……………………………………23

*Range v. Att'y Gen. United States of Am.,* 69 F.4th 96 (3rd Cir. 2023)…………….9

*Rex v. Sir John Knight,* 1 Comb. 38, 38–39, 90 Eng. Rep. 330 (K. B. 1686)…….19

*State v. Black,* 60 N.C. 262 (1864)……………………………………………..14

*State v. Buckley,* 2 Del. 552 (1838)……………………………………………..15

*State v. Oliver,* 70 N.C. 60 (1876)………………………………………………15

*State v. Rhodes*, 61 N.C. 453 (1868)……………………………………………14

*State v. Shelby,* 2 S.W. 468 (Mo. 1886)……………………………...……23

*Stimmel v. Sessions,* 879 F.3d 198 (6th Cir. 2018)………………….…………6

*Tyler v. Hillsdale County Sheriff's Dept.,* 837 F.3d 678 (6th Cir. 2016)………..4, 25

*United States v. Brown*, No. 2:22-cr-00239, 2023 WL 4826846 (D. Utah. Jul. 27, 2023)…………………………...………………………………………...9

*United States v. Combs,* No. 5:22-136, 2023 WL 1466614 (E.D.Ky. Feb. 2, 2023)…………………………………………………………………9

*United States v. Lewis,* No. 21-CR-789, 2023 WL 6066260 (S.D.N.Y. Sep. 18, 2023)……………………………………………………………...9

*United States v. Kays*, 624 F. Supp. 3d 1262 (W.D. Okla. 2022)……...…………9

*United States v. Rahimi,* 61 F.4th 443 (5th Cir.), *cert. granted,* 143 S. Ct. 2688 (2023)……………………….…………………………...….3, 4, 9, 22, 23

*United States v. Silvers*, No. 5:18-CR-50-BJB, 2023 WL 3232605 (W.D.Ky. May 3, 2023)……………...………………………………..….9

*United States v. Skoien (Skoien II),* 614 F.3d 638 (7th Cir. 2010)…………….………5

*United States v. Verdugo-Urquidez,* 494 U.S. 259 (1990)…………………….………5

*United States v. Yancey,* 621 F.3d 681 (7th Cir. 2010)…………………….…23, 24

*Wrenn v. District of Columbia,* 864 F.3d 650 (D.C. Cir. 2017)…………..…….28

**FEDERAL CONSTITUTION AMENDMENTS AND STATUTES**

U.S. Const. amend. I. …………………………………………………………..18

U.S. Const. amend. II……………………………………………………...1, 2, 7, 9

18 U.S.C. § 922(g)(8)…………………………………………………...passim

18 U.S.C. § 922(g)(3)………………………………………………………..24

Violent Crime Control and Law Enforcement Act. P.L.103-322…………………15

**STATE STATUTES**

2 *Perpetual Laws of the Commonwealth of Massachusetts* 259 (1801)…………..22

24 The State Records of North Carolina 89 (Walter Clark ed. 1905)…………….21

7 William Waller Hening, The Statutes at Large: A Collection of all the Laws of Virginia 35 (1820)…………………………………………….……....20

8 Statutes at Large of Pennsylvania from 1682 to 1801, 559-60…………………21

52 Archives of Maryland 54 (J. Hall Pleasants ed. 1935)…………………...20, 21

1777 N.J. Laws 90, ch. 40, § 20………………………………………………..21

1836 Mass. Laws 748, 750, ch. 134 § 16………………………………………26

1841 Me. Laws 709, ch. 169, § 16……………………………………………..28

1847 Va. Laws 127, ch. 14, § 16 ……………………………………………28

*A Collection of All Such Acts of the General Assembly of Virginia, of a Public and Permanent Nature, as Are Now in Force*, ch. 21, at 30 (1803)……….22

Ky. Rev. Stat. Ann. § 244.125……………………………………………….24

Ky. Rev. Stat. Ann. § 430.740(1)……………………………………………16

Mich. Rev. Stat. ch. 162, § 16, reprinted in The Revised Statutes of the State of Michigan 690, 692 (1846)……………………………………...………..28

Ohio Rev. Code Ann. § 2923.15……………………………………….......24

RCW 7.105.225……………………………………………………….....16

Tenn. Code Ann. § 39-17-1321(b)(1)………………………………………..24

Va. Code. Ann. § 16.1-253.1…………………………………………………16

**OTHER AUTHORITIES**

1 Journal of the Continental Congress 1774-1789 (1906)………..………………21

1 W. & M., ch. 2, § 7, in 3 Eng. Stat. at Large 441……………………….……18

1 William Blackstone, *Commentaries on the Laws of England*, 443 (1796)……...13

2 Bernard Schwartz, The Bill of Rights: A Documentary History 662 (1971)………………………………………………………………….6

4 William Blackstone, *Commentaries on the Laws of England* 301 (1769)……...18

Militia Act of 1662, 13 & 14 Car. 2, c. 3, § 13 (1662)…………………………17, 18

Ruth H. Bloch, *The American Revolution, Wife Beating, and the Emergent Value of Privacy*, 5 Early American Studies 223 (2007). …………..…………..…13, 14

Barbara J. Hart, *The Legal Road to Freedom*, in Battering and Family Therapy: A Feminist Perspective 13 (1993)……………………………………………15

Joyce Lee Malcolm, *The Right to Carry Your Gun Outside: A Snapshot History*, 83 L. & Contemporary Problems 195 (2020)…………………………………18

Elizabeth Pleck, *Criminal Approaches to Family Violence, 1640-1980*, 11 Crime and Justice 19 (1989)……………………………………………..…….13, 14

Diarmuid F. O'Scannlian, *Glorious Revolution to American Revolution: The English Origin of the Right to Keep and Bear Arms*, 95 Notre Dame L. R. 397 (2019)……………………………………………………...……17, 18

Eric Ruben & Saul Cornell, *Firearm Regionalism and Public Carry: Placing Southern Antebellum Case Law in Context*, 125 Yale L.J. Forum 121 (2015)……………………………………………..……...……..29

Peter Slocum, *Biting the D.V. Bullet: Are Domestic-Violence Restraining Orders Trampling on Second Amendment Rights?*, 40 Seton Hall L. Rev. 639 (2010)……………………………………………………..………..27

## STATEMENT CONCERNING ORAL ARGUMENT

Mr. Combs agrees with the United States that oral argument would assist the Court because the issue raised is one of first impression, and involves a challenge to the constitutionality of a federal statute.

## SUMMARY OF THE ARGUMENT

The Second Amendment protects an individual's right to keep and bear arms for self-defense. U.S. Const. amend. II; *District of Columbia v. Heller,* 554 U.S. 570, 635 (2008). Just last year, the Supreme Court, in *New York State Rifle & Pistol Ass'n v. Bruen*, reiterated the duty of courts to protect this fundamental right by abrogating means-end scrutiny when evaluating the constitutionality of a firearms regulation. 142 S.Ct. 2111, 2131 (2022). Now, when a modern firearms regulation is challenged, under the Second Amendment, plain text and history are controlling. *Id.*

Section 922(g)(8), the statute being challenged here, prohibits the possession of a firearm by individuals subject to protective orders. 18 U.S.C. § 922(g)(8). This can be based on the finding of a "credible threat", § 922(g)(8)(C)(i), or the mere order to refrain from actual or threatened use of physical force, § 922(g)(8)(C)(ii). Nothing more than a state court's entry of a domestic violence order and the possession of a firearm is required for a conviction.

When evaluating § 922(g)(8) under *Bruen's* analysis, it is facially unconstitutional. Section 922(g)(8)'s prohibited conduct – possession – is clearly

protected by the plain text of the Second Amendment. The government asserts that Combs is not covered by the Second Amendment because he is not a "law-abiding, responsible citizen," and thus not a member of "the people." Doc. 17, Page ID #29-35. This argument fails in the face of *Heller*. The government transparently attempts to shift the Court's focus from *conduct* to *status* to avoid its heavy historical burden. Possession of a firearm is conduct squarely protected by the Second Amendment. U.S. Const. amend. II; *Heller*, 554 U.S. at 635.

Turning to historical prong of *Bruen*, the government must proffer a historical analogue that is "distinctly similar," or "relevantly similar" to § 922(g)(8). *Bruen*, 142 S.Ct. at 2132-3. The government openly admits it cannot satisfy the more stringent "distinctly similar" burden, Doc. 17, Page ID #48, but still maintains it can offer a "relevantly similar" analogue. A "relevantly similar" analogue is one comparable in its burden and in its justification to § 922(g)(8). 142 S.Ct. at 2133. Given the historical record it provides, the government cannot satisfy either standard.

Instead of attempting to provide historical context for each of its proffered analogues, the government simply states the statutes exemplify a broader principle: disarmament of dangerous persons. Doc. 17, Page ID #35-48. It reaches beyond its own standard, however. It uses the term "dangerousness" as a justification for its principle but, in terms of applying the standard, *potentially dangerous* is all that is

needed. Doc. 17, Page ID #32-35. Despite setting this non-*Bruen* standard for itself, the government has failed to offer even one historical regulation which satisfies both metrics articulated in *Bruen*. Accordingly, the district court did not err in finding § 922(g)(8) unconstitutional.

## ARGUMENT

*New York State Rifle & Pistol Ass'n v. Bruen* changed the analytical standard courts must use to evaluate Second Amendment challenges to firearm regulations. The test is no longer one of means-end scrutiny but rather is based on plain text and history. *Bruen,* 142 S.Ct. at 2131. The conduct prohibited by § 922(g)(8) is constitutionally protected by the plain text of the Second Amendment. Moreover, the government cannot provide a historical analogue which is sufficiently similar to pass constitutional muster. Thus, this Court should find § 922(g)(8) unconstitutional on its face and affirm the district court's ruling.

### 1.  The Court should not hold this case in abeyance pending *Rahimi*.

Combs is in agreement with the government that this court need not await the Supreme Court's decision in *Rahimi*. *Rahimi*. *United States v. Rahimi,* 61 F.4th 443 (5th Cir.), *cert. granted,* 143 S. Ct. 2688 (2023). The reasons for this are slightly different than those the government proffers. First, Combs has a substantial speedy trial interest in resolving this issue, based on a timely-filed motion to dismiss, without further delay.  Second, Combs has been subject to home incarceration

(converted to home confinement) as a condition of his pretrial release on the charge pending in Count 2 of the Indictment.  Order Setting Condition of Release, R.64, Page ID # 294; Minute Entry for Status Conference, R.72, Page ID # 311. These conditions will remain in effect until resolution of Count 2. Third, the District Court's Order dismissing Count 1 on Second Amendment grounds is a straight forward and correct application of the *Bruen* standard, thus affirming that decision should be equally straight forward. Finally, the government is not prejudiced by a decision from this court as the issue it seeks to litigate in this forum is adequately protected by its appeal to the Supreme Court in *Rahimi*, in the event of an adverse decision here. This Court should therefore decide the issue presented without further delay.

## 2. Section 922(g)(8)'s prohibited conduct is protected by the Second Amendment.

### A. *Heller* was clear that the Second Amendment protects the right of "the people."

While the government contends that the U.S. Supreme Court held in *Heller*, and *Bruen*, that the Second Amendment protects only the right of "law abiding, responsible citizens," it misapprehended the Court.[1] The *Heller* Court conducted a

---

[1] Significantly, the *Bruen* Court "decide[d] nothing about who may lawfully possess a firearm." 142 S.Ct. at 2157 (Alito, J., concurring). Likewise, this Court has already foreclosed such a broad interpretation of the *Heller's* language. *See Tyler v. Hillsdale County Sheriff's Dept.,* 837 F.3d 678, 687 (6th Cir. 2016) ("[T]he language warns readers not to treat *Heller* as containing broader holdings than the Court set out to

meticulous analysis of the term "the people," asserting that "in all six other provisions of the Constitution" where it is used the term, it "unambiguously refers to all members of the political community, not an unspecified subset." 554 U.S. at 580. *Heller* further explained that the term signifies "a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community." *Id.* (quoting *United States v. Verdugo-Urquidez,* 494 U.S. 259, 265 (1990)).

Thus, the Supreme Court's use of the phrase "law-abiding, responsible citizens" served a purely *descriptive* function. First, the phrase referred to the individual challengers in *Heller*, *McDonald*, and *Bruen* who were all "law abiding, responsible citizens." Additionally, it was used to emphasize that there are "presumptively lawful" prohibitions on certain categories of persons, i.e., felons and the mentally ill.[2] *Id.* at 626-27, n. 26. The *Heller* Court was crystal clear when it stated there is "a strong presumption that the Second Amendment right is exercised individually and *belongs to all Americans*." *Id.* at 581. Mr. Combs, and others similarly situated, are undoubtedly members of "the people."

---

establish: that the Second Amendment creates individual rights, one of which is keeping operable handguns at home for self-defense." *Id.* (quoting *United States v. Skoien (Skoien II),* 614 F.3d 638, 640 (7th Cir. 2010) (en banc)).

[2] This is evidenced by the phrase "law-abiding, responsible citizens" failing to appear in the Court's "the people" analysis.

Moreover, the government's reliance on isolated, unadopted proposals in support of its power to disarm individuals who are not "law-abiding, responsible" citizens" is unimpressive. The first proposal proffered by the government comes from Pennsylvania's ratifying convention, stating that individuals should have the right to bear arms "unless for crimes committed, or real danger of public injury." 2 Bernard Schwartz, The Bill of Rights: A Documentary History 662, 664 (1971). The second proposal is from Massachusetts's convention where Samuel Adams proposed limiting the right to bear arms to citizens considered "peaceable." *Id.* The language proposed at Pennsylvania and Massachusetts failed to become incorporated into the Second Amendment and thus cannot bear any influence.

In fact, this Court, in a pre-*Bruen* case, has already rejected the government's use of these conventions. *Stimmel v. Sessions,* 879 F.3d 198, 205 (6th Cir. 2018). In *Stimmel*, this Court noted that the while the *Heller* Court did consider the Pennsylvania Convention proposal as being "highly influential," the context of such influence was limited. *Id.* (noting *Heller's* holding was that the Second Amendment secures an individual right). The Court explained that *Heller* never discussed the "unless crimes" clause of the Pennsylvania proposal, and further that the plain text of the Second Amendment failed to incorporate the suggested language. *Id.*

Likewise, Samuel Adam's proposed "peaceable citizens" limitation failed to become incorporated into the Second Amendment. In fact, the government even

recognized that these proposals "used different language from the Second Amendment." Doc. 17, Page ID #32. When text itself is the point of inquiry as it is here, *Bruen,* 142 S.Ct. at 2126, it is hard to understand why the absence of text is persuasive. Simply put, the text of the Second Amendment reads "the people," and individuals subjected to civil orders are among that class.

      **B.**     **Adopting the Government's "law-abiding, responsible citizens" limitation is to reject *Bruen's* "rights-protective" analysis.**

Limiting the right to keep and bear arms to "law-abiding, responsible citizens" is little more than the government's attempt to salvage means-end scrutiny – disguised as dangerousness – in the firearms context. *Bruen* abrogated means-end scrutiny, 142 S.Ct. at 2127, favoring a test which is "rights-protective." *Ingram v. Wayne County, Michigan,* 81 F.4th 603, 624 (6th Cir. 2023) (Thapar, J., concurring). Thus, while the government's proffered statistics may be concerning from a public policy perspective, they are irrelevant under *Bruen's* historical standard.

Statistics may provide the government with a credible interest for disarmament in this context, but they cannot be used as justification for § 922(g)(8). *Bruen,* 142 S.Ct. at 2126. Now, the focus is on plain text and history. The plain text provides the right for "the people" – a term the Supreme Court has already defined more broadly. U.S. Const. amend. II; *Heller,* 554 U.S. at 580-81.

The Supreme Court has persistently declared that this right is not "a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees." *Bruen,* 142 S.Ct. at 2156 (quoting *McDonald v. City of Chicago* 561 U.S. 742, 780 (2010) (plurality opinion)). To adopt the government's "law-abiding" limitation as to only the Second Amendment would be to say the right to keep and bear arms is inferior to other constitutional protections. The Supreme Court has explicitly rejected that position.

Further, if this Court accepts the government's newfound definition of "the people" in terms of the Second Amendment, it must find a way to square that with the text of the First and Fourth Amendments. *See Heller,* 554 U.S. at 644 (Stevens, J., dissenting) ("But the class of persons protected by the First and Fourth Amendments is *not* so limited; for even felons (and presumably irresponsible citizens as well) may invoke the protections of those constitutional provisions."). Imposing arbitrary qualifications on one's eligibility for exercising a fundamental right is a slippery slope that doubles will have unintended consequences. Grafting such a limitation on the Second Amendment's application to "the people" has no basis in text or history.

### C.    *Bruen* focuses on conduct, and the conduct prohibited by § 922(g)(8) is protected by the Second Amendment.

Finally, the government's theory mistakenly tries to shift the Court's focus from the proper inquiry of *conduct* to one of *status*.[3] *Bruen* was clear: "[i]n keeping with *Heller*, we hold that when the Second Amendment's plain text covers an individual's *conduct*, the Constitution presumptively protects that *conduct*." 142 S.Ct. at 2126 (emphasis added). Mr. Combs' *conduct* – possession of a firearm - is protected by the Second Amendment. The Second Amendment protects the right to "keep and bear arms." U.S. Const. amend. II. As the Supreme Court noted in *Heller*, to "keep" is "to hold; to retain in one's power or possession." 554 U.S. at 582. Section 922(g)(8) prohibits the *possession* of a firearm by an individual subject to a protective order. 18 U.S.C. § 922(g)(8). Thus, the conduct prohibited under § 922(g)(8) – possession of a firearm – is indisputably protected by the Second Amendment's plain text.

---

[3] Almost every court has applied the *Bruen* Court's conduct analysis, rejecting the government's status-based theory. *See e.g., Rahimi,* 61 F.4th at 451-53; *Range v. Att'y Gen. United States of Am.,* 69 F.4th 96, 100-103 (3rd Cir. 2023); *United States v. Combs,* No. 5:22-136, 2023 WL 1466614, at *2-3 (E.D.Ky. Feb. 2, 2023); *United States v. Silvers,* No. 5:18-CR-50-BJB, 2023 WL 3232605, at *4-7 (W.D.Ky. May 3, 2023); *United States v. Lewis,* No. 21-CR-789, 2023 WL 6066260, at *4 (S.D.N.Y. Sep. 18, 2023); *United States v. Brown,* No. 2:22-cr-00239, 2023 WL 4826846, at *5-6 (D. Utah. Jul. 27, 2023); *United States v. Kays,* 624 F. Supp. 3d 1262, 1265-6 (W.D. Okla. 2022).

### 3. The district court correctly concluded that the government failed to proffer a proper historical analogue § 922(g)(8).

The district court did not err when it rejected each of the government's proffered analogues for failing to satisfy *Bruen*. *Bruen* highlighted two different methods of analyzing the constitutionality of a modern regulation. When the societal problem underlying the regulation has "persisted since the 18th century," the government must provide a "distinctly similar historical regulation addressing that problem." 142 S.Ct. at 2131. If, however, the Court finds that domestic violence is a newer societal concern, the government only needs to provide an analogue which is "relevantly similar." *Id.* at 2132-3.

Logically speaking, an analogue which is "distinctly similar" is a stricter standard to meet. While the *Bruen* Court did not articulate what exactly must be shown under this standard, it is reasonable to conclude that only a historical regulation which is decidedly similar to the one being challenged suffices. The government has failed, as it acknowledges, to provide any historical support of a clear analogue to the statute at issue. Doc. 17, Page ID #48 ("Thus, § 922(g)(8) is consistent with historical tradition even though *it does not burden firearm possession in precisely the same way or for precisely the same reasons* as founding-era laws.") (emphasis added).

Turning to the lower "relevantly similar" standard, as guideposts, *Bruen* provided two metrics to assist in making this determination: the historic and modern

regulations have a (1) comparable burden; and (2) are comparably justified. 142 S.Ct. at 2133. Contrary to the government's claim that the district court demanded a "historical twin," and "erred by focusing on. . .superficial distinctions," Doc. 17, Page ID #53, the district court simply followed the Court's guidance and drew *material distinctions* based on those metrics. Memorandum Opinion and Order, R.33, Page ID #139-141.

According to the government, the district court erred by applying these metrics too attentively. *E.g.,* Doc. 17, Page ID #54 ("Both § 922(g)(8) and the loyalty oath laws are aimed at potentially dangerous people; the exact reason for the danger does not matter. Accordingly, the district court erred in concluding that § 922(g)(8) is inconsistent with the historical tradition of firearm regulation."). But the district court's focused analysis precisely tracked that of *Bruen*. *E.g.,* 142 S.Ct. at 2142 ("At the very least, we cannot conclude from this historical record that, by the time of the founding, English law would have justified restricting the right to publicly bear arms suited for self-defense only to those who demonstrate some special need for self-protection."); *id.* at 2148-9 ("Thus, unlike New York's regime, a showing of special need was required only *after* an individual was reasonably accused of intending to injure another or breach the peace. And, even then proving special need simply avoided a fee rather than ban.")

So, the district court did not demand a "dead ringer" or "historical twin;" it merely applied the Court's two metrics without getting ensnared in broad concepts, like dangerousness.[4] For example, when the district court rejected the government's loyalty oath statutes as having an incomparable justification, it recognized that disarmament while under a civil protective order was dissimilar from disarmament for political reasons. Memorandum Opinion and Order, R.33, Page ID #141. Likewise, the district court understood that § 922(g)(8)'s burden of complete deprivation was materially different from the mere inconvenience imposed by the surety statutes. R. 33, Page ID #139. The district court analyzed these laws in the context of their historical application and reasoning before rejecting them as unsatisfactory. Thus, it did exactly what *Bruen* required. *See* 142 S.Ct. at 2133 (stating courts should not uphold a modern law because it "remotely resembles" a

---

[4] The Supreme Court even noted that there is a potential concern for courts not properly applying analogical reasoning,

> This does not mean that courts may engage in independent means-end scrutiny under the guise of an analogical inquiry. Again, the Second Amendment is the "product of an interest balancing *by the people*," not the evolving product of federal judges. *Heller*, 554 U.S. at 635, 128 S.Ct. 2783 (emphasis altered). Analogical reasoning requires judges to apply faithfully the balance struck by the founding generation to modern circumstances, and contrary to the dissent's assertion, there is nothing "[i]roni[c]" about that undertaking. *Post,* at 2179. It is not an invitation to revise that balance through means-end scrutiny.

142 S.Ct. at 2133, n. 7 (emphasis added).

historical analogue since this would endorse laws which historically would have never been accepted.").

### A.  The criminalization of domestic violence is far from a "modern sensibility."

Historically, domestic violence in England and early America was not as tolerated as many believe. Although some reports indicate that husbands could reasonably modify their wife's behavior, *see* 1 Matthew Bacon, New Abridgement of the Law, 285 (1778), other reports indicate that domestic abuse was never legal. *See* 1 William Blackstone, *Commentaries on the Laws of England*, 443-4 (1796).

The Colony of New Haven, in 1639, enacted "the first American law against family violence." *See* Elizabeth Pleck, *Criminal Approaches to Family Violence, 1640-1980*, 11 Crime and Justice 22 (1989). Only two years later, the Massachusetts Bay Colony explicitly outlawed "wife beating." *Id.* at 19. According to Pleck, one study from 1630 to 1699 found that 128 men were tried for verbally and/or physically assaulting their wives. *Id.* at 25. In 1666, a man from Maine was charged with "sleighting and abuseing" his wife. *See* Ruth H. Bloch, *The American Revolution, Wife Beating, and the Emergent Value of Privacy*, 5 Early American Studies 223, 231 (2007).

Later, in 18th century America, wives could implore the justice of peace regarding their abuse.[5] The justice of the peace would require the husband to either post a bond or stake pledges to guarantee good behavior. *See* Bloch, at 233. Furthermore, while assault and battery were typically handled civilly, domestic abuse was viewed only in the *criminal* context. *Id.* at 236-7. By the 19th century, domestic violence had shifted from being a breach of the peace to being categorized as assault and battery. *Id.* at 240. Tennessee, in 1850, and Georgia, in 1857, were the two first states to enact explicit laws prohibiting domestic violence. *See* Pleck, at 32.

Additionally, three appellate cases from the 1800s demonstrate that domestic violence was a criminal matter. In *Bradley v. State*, the Mississippi Supreme Court found the defendant guilty of assault and battery of his wife. 1 Miss. 157 (1824). The other two cases come from North Carolina, in 1864 and 1868 respectively. *State v. Black,* 60 N.C. 262 (1864); *State v. Rhodes*, 61 N.C. 453 (1868). The North Carolina cases did recognize that a husband had a limited right to "correct" his wife if such "correction" was modest. The court nonetheless noted that its stance was "not in unison with the decisions of some of the sister States." 61 N.C. at 459. The

---

[5] *E.g.,* George Webb, *The Office and Authority of a Justice of Peace* 56 (1736) (Va.); James Davis, *The Office and Authority of a Justice of the Peace* 65 (1774) (N.C.); Joseph Greenleaf, *Abridgement of Burn's Justice of the Peace* 343 (1773) (Mass.); Richard Starke, *The Office and Authority of a Justice of Peace Explained and Digested* 333 (1774); James Parker, *Conductor Generalise or The Office, Duty and Authority of Justices of the Peace* 397 (1788) (N.Y.).

punishment for such crimes was typically a fine,[6] the more serious cases involved imprisonment and lashings.[7]

Finally, the latter half of the 20th century is when the prevention of and protection against domestic violence gained significant social traction. In 1976, D.C. began issuing protective orders. *See* Barbara J. Hart, *The Legal Road to Freedom*, in Battering and Family Therapy: A Feminist Perspective 13, 18 (1993). It took another thirteen years before all other states followed suit. *Id.* In terms of firearm use in domestic violence, § 922(g)(8) was enacted in 1994 as part of the Violent Crime Control and Law Enforcement Act. P.L.103-322. Thus, domestic violence has always been a concern—and crime—in America.

### B. The government's dangerousness standard colors outside the lines of *Bruen*.

Dangerousness is far too broad of a justification for § 922(g)(8). The government believes that if it can establish a historical *principle* under *Bruen*, then any modern regulation which satisfies that *principle* is constitutional. *Bruen*, however, requires something much narrower. The Court was clear that a side-by-side inspection of the historical and modern regulations is necessary.

---

[6] *See, e.g., State v. Buckley,* 2 Del. 552 (1838) (husband fined and bound by surety of the peace); *State v. Oliver,* 70 N.C. 60 (1876) (husband fined $10).

[7] *See, e.g., Foote v. State,* 59 Md. 264 (1883) (imprisoned 60 days and 7 lashings by sheriff).

In other words, a mishmash of inadequate statutes cannot be sewn together and presented as a historical tradition. 142 S.Ct. at 2132 (explaining "[l]ike all analogical reasoning," this analysis requires "a determination of whether the *two regulations* are 'relevantly similar.'") (emphasis added). Moreover, this tapered approach for analyzing the constitutionality of firearm regulations is not new. *Id.* at 2128 (highlighting that the *Heller* Court "addressed *each* purported analogue. . . .") (emphasis added).

Dangerousness, as the government uses it, is nothing more than a superficial catchall term meaning all persons the legislature wants to disarm on the basis of public safety—regardless of how tenuous that concern may be. Section 922(g)(8) disarms a wide category of individuals. The statute permits disarmament of those considered a "credible threat,"[8] and those prohibited from the use of physical force against an intimate partner or child. § 922(g)(8)(C)(i)-(ii). Disarmament applies even when the civil order was granted based on stipulation. So, the government's dangerousness theory, at least in this context, is really focused on those considered *hypothetically* dangerous. The Second Amendment may not be unlimited, but it certainly protects against conjecture.

---

[8] State courts are making these "threat" findings using the preponderance of the evidence standard as these are *civil* disputes. *E.g.,* Ky. Rev. Stat. Ann. § 430.740(1); RCW 7.105.225; Va. Code. Ann. § 16.1-253.1; *Odden v. Rath*, 730 N.W.2d 590 (N.D. 2007); *Felton v. Felton,* 679 N.E.2d 672 (Ohio. 1997).

Continuing, the *Bruen* Court has already rejected using such an all-consuming methodology for this type of analysis. *See* 142 S.Ct. at 2132-34 (rejecting expansion of "sensitive places" to "all places of public congregation that are not isolated from law enforcement" for being too broad.) *Bruen* requires courts take a narrower look than the 30,000-foot view the government proposes; it requires analogical reasoning of the regulations. As the Court does this, it will find that the government has failed to meet its burden.

### i.   English history supports that dangerousness was considered a *political* categorization.

Late 17th century English history does illustrate the disarmament of those deemed dangerous, but the justification for the categorization was politically motivated. In mid-1600s, England was enmeshed in religious and political strife between the Catholic Crown and Protestant Parliament. *Bruen,* 142 S.Ct. at 2140; *see* Diarmuid F. O'Scannlian, *Glorious Revolution to American Revolution: The English Origin of the Right to Keep and Bear Arms*, 95 Notre Dame L. R. 397, 401 (2019). After Parliament passed laws disarming Catholics, King Charles I enacted the 1662 Militia Act upon regaining control of England which disarmed those "dangerous to the Peace of the Kingdom." Militia Act of 1662, 13 & 14 Car. 2, c. 3, § 13 (1662); *see* O'Scannlian, at 401. Primarily, disarming Protestants and those who had fought for Parliament. *See* O'Scannlian, at 401.

Political oppression via disarmament continued in the country and in 1685 King James II took the throne where he used both the Militia Act of 1662 and the Game Act of 1671 to continue disarming Protestants. *See* O'Scannlian, at 402; *Heller,* 554 U.S. at 592-3. Upon James II fleeing, Parliament was quick to act in securing (and later codifying in the English Bill of Rights) the liberties of its members, including: "That the Subjects which are Protestants may have Arms for their Defence suitable to their Conditions and as allowed by Law." 1 W. & M., ch. 2, § 7, in 3 Eng. Stat. at Large 441; *see* Joyce Lee Malcolm, *The Right to Carry Your Gun Outside: A Snapshot History*, 83 L. & Contemporary Problems 195, 204 (2020). The disarmament of these individuals was for the sole purpose of restricting the political community as the sovereign deemed fit. The United States Constitution clearly delineates that religious or political expression cannot be used to ban someone from exercising a fundamental right. U.S. Const. amend. I. These analogues cannot contribute to our understanding of the Second Amendment since they are over one-hundred years removed for the ratification of our Bill or Rights – and further, are an exemplar of why we revolted from England more generally.

Next, the government's "going armed" statutes fail as they criminalized *actual* dangerousness, i.e., not the suppositious kind that § 922(g)(8) does. Starting with the Statute of Northampton, this law forbade "going armed" to create affray or terror in the king's subjects. 4 William Blackstone, *Commentaries on the Laws of England*

301-02 (1769). As the *Bruen* Court itself explained, this statute "has little bearing on the Second Amendment adopted in 1791." 142 S.C.t at 2139 (detailing the large temporal gap between the statute's initial enactment and the Second Amendment's ratification: more than 450 years).

Even the statute's most notable case, *Rex v. Sir John Knight* from 1686, illustrates that firearm misuse was a prerequisite for violation. In *Sir John Knight*, the defendant was accused by the Crown of wrongfully using his firearm to invoke terror into the king's subjects. 1 Comb. 38, 38–39, 90 Eng. Rep. 330 (K. B. 1686). After the Chief Judge's remarks that the statute had fallen into disuse, Sir John Knight was acquitted as no evidence of evil intent was proven. *Id.* Knight's mere possession of a firearm was not enough for a conviction. *Id.*

Analogizing § 922(g)(8) to the Statute of Northampton fails since the two are starkly different. The Statute of Northampton invoked a burden on the right to keep and bear arms only after a *conviction*, where evil intent to misuse the firearm had to be proven. Here, § 922(g)(8) requires only that an individual be subject to a civil order – irrespective of the reasoning or validity behind the order. Furthermore, the English statute required misuse to be proven beyond a reasonable doubt. Section § 922(g)(8) criminalizes lawful use in anticipation of impending misuse. Thus, these two statutes have both incomparable burdens and justifications.

Case: 23-5121    Document: 18    Filed: 11/22/2023    Page: 28

All in all, English history offers the government no help. Excluding citizens from exercising their rights based on political and religious ideology is not "relevantly similar" to banning possession to prevent chance, individualized harm. In fact, the government has offered nil to support that 17th century England banned those accused of any type of domestic row from possessing a firearm for self-defense. Even the broader Statute of Northampton demanded proof that the firearm be used to invoke terror. Here, § 922(g)(8) does not criminalize threats made with a firearm, brandishing of the weapon, or anything that could be said to invoke terror. Section 922(g)(8) criminalizes lawful use (possession), something the king's bench refused to even do.

### ii. Dangerous individuals in early America consisted of (1) political dissidents and (2) those who offensively misused their firearm and were convicted of doing so.

Early American history fairs no better for the government. Many of these statutes disarmed Catholics and others considered political dissidents. In 1756, both Maryland and Virgina disarmed the Catholic practitioners. 52 Archives of Maryland 54 (J. Hall Pleasants ed. 1935); 7 William Waller Hening, The Statutes at Large: A Collection of all the Laws of Virginia 35 (1820). Pennsylvania followed suit in 1759. 5 The Statutes at Large of Pennsylvania from 1682 to 1801, 627 (WM Stanley Ray ed. 1898). Additionally, there was a wave of disarming loyalists. Maryland disarmed

those who refused to swear an oath to King George III. 52 Archives of Maryland, at 451-52.

Virginia took a different approach, excluding those from disarmament who took the oath; however, it still permitted those it disarmed to retain their arms for self-defense of their person and home through an order by the justice of the peace. 7 Hening, at 36-37. Individuals disarmed under these statutes, if they could not retain their firearms via the justice of the peace, had the ability to regain their right. Later, in 1776, the Continental Congress adopted this style of political disarmament, recommending those "disaffected" to the "United colonies" be disarmed. 1 Journal of the Continental Congress 1774-1789, 285 (1906). States soon followed suit, enacting such laws.[9] As explained regarding English history, politically motivated disarmament does not bode well with our understanding of our Nation's foundation. Further, it's not comparable to the individualized harm here. Once again, a rejection of the government's broad dangerousness principle is necessary or else, at some point, it will start to swallow the whole.

Additionally, the *three* adopted versions of the Statute of Northampton offered by the government are not a "well-established" historical tradition. *See Bruen,* 142 S.Ct. at 2142 ("[W]e doubt that *three* colonial regulations could suffice to show a

---

[9] 8 Statutes at Large of Pennsylvania from 1682 to 1801, 559-60; 1777 N.J. Laws 90, ch. 40, § 20; 24 The State Records of North Carolina 89 (Walter Clark ed. 1905).

tradition of public-carry regulation.") (emphasis added). These laws criminalized a narrow class of offensive conduct, not mere possession.[10] Conversely, § 922(g)(8) criminalizes use protected by the plain text of the Second Amendment – possession. Under § 922(g)(8), the burden is imposed *before* one can even *lawfully* use a firearm.

As the Fifth Circuit in *Rahimi* put it perfectly, "[i]n other words, where "going armed" laws were tied to violent or riotous conduct and threats to society, § 922(g)(8) implicates a much wider swath of conduct, not inherently dependent on any actual violence or threat. 61 F.4th at 458. Since the substance of the "going armed" statutes are significantly different from § 922(g)(8), the statutes must fail. Also, the burden for a conviction of "going armed" was far less than that of § 922(g)(8). North Carolina's "going armed" statute never even provided for forfeiture of the convict's firearm, Massachusetts removed forfeiture as a penalty in 1795, and Virginia

---

[10] Virginia's law, Act Forbidding and Punishing Affrays in 1786, stated individuals could not go armed in fairs, markets, or other places to terror of the country. *A Collection of All Such Acts of the General Assembly of Virginia, of a Public and Permanent Nature, as Are Now in Force*, ch. 21, at 30 (1803). There are no reported cases of this statute being enforced. Massachusetts enacted something similar in 1795, providing citizens could not go armed in an offensive manner to the terror of the good citizens. 2 *Perpetual Laws of the Commonwealth of Massachusetts* 259 (1801). Later, in 1825, the state highlighted that the triggering element of offensive conduct stems from the misuse of the firearm. *See Commonwealth v. Blanding,* 20 Mass. (3 Pick.) 304, 314 (1825) ("The liberty of the press was to be unrestrained, but he who used it was to be responsible in case of its abuse; like the right to keep fire arms, which does not protect him who uses them for annoyance or destruction.").

followed suit in 1847. *Id.* at 458. So, not only was the *Rahimi* court right that §
922(g)(8) criminalizes broader conduct, but it also imposes a more extensive burden.

Next, the government analogizes to "those below certain ages, those of
unsound mind, vagrants, and intoxicated persons" are unsatisfactory. Doc. 17, Page
ID #44. First, those of "unsound mind" were categorically banned from possessing
firearms as they were not a part of "the people." *United States v. Yancey,* 621 F.3d
681, 685 (7th Cir. 2010). As for those intoxicated, the government offers only three
statutes, with two coming after the Reconstruction-era. Doc. 17, Page ID #44. Three
statutes are not a "well-established" tradition. Furthermore, these statutes did *not*
"attempt[t] to regulate [the individual's] behavior in the privacy of his own home,"
*Powell v. State of Texas,* 392 U.S. 514, 532 (1968), like § 922(g)(8) does.

According to *State v. Shelby*, even if one was intoxicated while carrying their
firearm, the offense was a misdemeanor for which only a fine was imposed. 2 S.W.
468, 469-70 (Mo. 1886). Additionally, the court viewed the statute as equivalent to
a time, place, manner restriction. *Id.* at 469 ("If this may be done as to time and
place, as is done by that act, no good reason is seen why the legislature may not do
the same thing with reference to the condition of the person who carries such
weapons."). Even today, most states prevent the carrying of a weapon in a place

where alcohol is served and/or from drinking while carrying.[11] Individuals subjected to protective orders, if permitted to exercise their fundamental right to keep and bear arms, would still have to abide by their state's respective laws. So, it is hard to see how these intoxicated person restrictions are relevant to the more finite ban of § 922(g)(8).

Also, these categorical bans based on the "condition" of the individual only call into question how tenable the government's theory is. In *Yancey*, the Seventh Circuit highlighted that 18 U.S.C. § 922(g)(3)'s ban "extends only so long as [the defendant] abuses drugs. In that way, [the defendant] himself controls his right to possess a gun." 621 F.3d at 687. How can this be, using the government's definition? Because actual dangerousness is not required, only *potential* dangerousness is. Doc. 17, Page ID #32-35.

Much like the irrelevant policy argument the government made in this case, *see* Doc. 17, Page ID #32-35, statistics about relapse rates, the connection between drug abuse and criminality, *inter alia*, could be proposed to support complete disarmament of even sober individuals. The chance of danger is all that matters, right? The differentiating factor is that the government must prove beyond a reasonable doubt, per § 922(g)(3), that the individual is an "unlawful user" or

---

[11] *E.g.,* KY. Rev. Stat. Ann. § 244.125 (prohibits possessing loaded gun in room where alcohol is sold by the drink); Tenn. Code Ann. § 39-17-1321(b)(1) (prohibits possessor from drinking while carrying); Ohio Rev. Code. Ann. § 2923.15 (same).

"addict," so dangerousness is implicit in that "condition." Without proving this "condition," a conviction cannot stand.

By contrast, the government gets off much easier with § 922(g)(8) by not having to prove dangerousness in any fashion. In fact, the court granting the protective order does not even make such a finding before issuance. Take Mr. Combs case for example, his indictment stands on § 922(g)(8)(C)(ii) as no "credible threat" was found by the state court. Indictment, R.5, Page ID #10. Moreover, the government's distinction between § 922(g)(8)(C)(i)'s "credible threat" language and § 922(g)(8)(C)(ii)'s vague, all-encompassing language is that the latter involves a finding of a "real threat." Doc. 17, Page ID #45. A "real threat" is proven via empirical evidence, *id.*, which seems awfully reminiscent of the abrogated means-end scrutiny reasoning. *See Tyler,* 837 F.3d at 694-7 (noting empirical data was needed to support intermediate scrutiny).

Consequently, the government's early American history recitation cannot support § 922(g)(8)'s constitutionality. Notably, the types of statutes the government offers are offenses which are still around today in some form. Mr. Combs, along with every other person subjected to a protective order, can still be prosecuted for carrying a gun while intoxicated or for using a firearm in a threatening manner. However, § 922(g)(8) goes far beyond this; it criminalizes mere possession. Moreover, the statutes proffered focus on the public more generally whereas §

25

922(g)(8) implicates a private row. The government has been unable, both here and in the district court, to provide even one historical analogue of disarmament due to a private civil dispute. All in all, early American history only supports § 922(g)(8)'s unconstitutionality.

### iii. The post-founding surety statutes demonstrate that even those found to be a "threat" still could enjoy their right to keep and bear arms.

Despite the government's contention, the surety laws cannot serve as a sufficient historical analogue to § 922(g)(8) as the burdens are incomparable. In 1836, Massachusetts enacted a surety law requiring that an individual either show a special need for self-defense or post a surety to keep publicly carrying after an individual breach of peace action was brought. 1836 Mass. Laws 748, 750, ch. 134 § 16. Nine other states followed Massachusetts, enacting similar statutes between 1836 and 1871. *Bruen,* 142 S.Ct. 2148, n. 23. These statutes are the closest analogue the government has tendered since they are comparably justified in the purpose of protecting individuals from the reasonable likelihood of harm. *See* William Rawle, A View of the Constitution of the United States of America 126 (2d ed. 1829) (detailing surety only required when "just reason to fear that he purposes to make an unlawful use of them."). Nonetheless, they still fail because the burden imposed is significantly less than that imposed by § 922(g)(8).

First, the surety statutes imposed more of an inconvenience than a burden. These statutes required a showing of need or the posting of a surety if a threat was found by the justice of the peace. Posting a surety can be thought of as akin to posting bail against any future misconduct. The individual was still able to exercise their right to carry if they fulfilled one of these two conditions. In contrast, § 922(g)(8) carries a much more severe burden as it completely prohibits the possession of a firearm. Section 922(g)(8) does not permit a showing of need or the posting of a surety for the retention of one's Second Amendment right. A mere inconvenience to exercising one's right is substantially different from a complete deprivation to do so.

Next, § 922(g)(8) being based on a court finding does not carry more weight than the surety statutes' oath. A court's issuance of a protective order may make the "threat" appear more credible, but this external legitimacy is shaky. The rate of protective order issuance is high. *See* Peter Slocum, *Biting the D.V. Bullet: Are Domestic-Violence Restraining Orders Trampling on Second Amendment Rights?*, 40 Seton Hall L. Rev. 639, 667-68 (2010) (explaining the fervent nature of judges to grant these orders). Courts being overly eager to grant protective orders makes the burden of § 922(g)(8) even more severe as one's constitutional right to keep and bear arms may be completely deprived over a judge's personal, extra-judicial concern of bad press. *Id.* at 667, n. 213.

Moreover, § 922(g)(8) has no procedural mechanism by which the burden can be minimized, contrary to the surety statutes. Section 922(g)(8)'s burden is a complete prohibition on the right to keep arms, with no exceptions. Although the surety laws may have imposed a burden on the right to carry, the burden could be abated by the showing of special need or by posting a surety bond. *Wrenn v. District of Columbia,* 864 F.3d 650, 661 (D.C. Cir. 2017). The ability for individuals to shrink their burden under the surety laws shows how incomparable these laws are to § 922(g)(8) and illustrates the burden of the latter as being much more exacting.

Furthermore, despite what the government may suggest, the burden of § 922(g)(8) is not short-lived. For example, a protective order in Kentucky is typically for three years and may be reissued solely on the plaintiff's request. *See Kingrey v. Whitlow,* 150 S.W.3d 67, 68 (Ky.Ct.App. 2004) ("[W]e do not read the statute as requiring proof of additional acts of domestic violence or abuse during the prior period before a domestic violence order may be reissued. . . ."). Historically, the surety statutes were capped for a period of six to twelve months, depending on the state. See 1841 Me. Laws 709, ch. 169, § 16 (six months); Mich. Rev. Stat. ch. 162, § 16, reprinted in The Revised Statutes of the State of Michigan 690, 692 (1846) (six months); 1847 Va. Laws 127, ch. 14, § 16 (twelve months). In short, a complete ban under § 922(g)(8) can last for years with no definite end in sight whereas the burden of a bond lasted only a few months. Protective orders may not be as temporary as

one would think at first glance, and certainly not so in comparison to the minor temporal constraints associated with posting sureties. Consequently, § 922(g)(8) carries a stern temporal burden dissimilar to these minimally limiting laws.

So, the low threshold to obtain – and maintain – protective orders make the burden associated with § 922(g)(8) much greater than the requirement of merely posting a surety or showing a need for self-defense. Certainly, for instance, an individual subject to such an order would like to pay a $250 fine and keep possession of their firearms for self-defense. This is not an option provided to individuals under § 922(g)(8). However, it was available under the surety statutes. This simple illustration shows the markedly stark distinction between the two. Thus, the surety statutes are significantly different and as a result cannot serve as a historical analogue.

Finally, the lack of enforcement of the surety laws additionally supports why these laws cannot serve as a proper historical analogue. There is only one known recorded case, and the surety requirement was declined despite a complaint regarding threats of serious bodily harm. *Grover v. Bullock,* No. 185 (Worcester Cty., Aug. 13, 1853); Eric Ruben & Saul Cornell, *Firearm Regionalism and Public Carry: Placing Southern Antebellum Case Law in Context*, 125 Yale L.J. Forum 121, 130, n. 53 (2015). Additionally, the only other examples of the laws being enforced involved pretextual applications. *Bruen,* 142 S.Ct. at 2149. These laws were enacted

in ten states yet there is only one recorded case and a handful of pretextual examples. This is not the type of *historical tradition* that the *Bruen* Court required. *See id.* at 2149 (slight evidence of enforcement of surety laws "is surely too slender a reed on which to hang a historical tradition of restricting the right to public carry."). Hence, because there is no established pattern of the surety statutes being enforced, they cannot be a proper historical analogue under *Bruen*.

## CONCLUSION

Section 922(g)(8) is unconstitutional as the conduct prohibited by the statute is clearly protected by the plain text of the Second Amendment and the government has failed to meet its burden of providing a proper historical analogue. A mixed bag of statutes standing for an il-defined, malleable principle is not what *Bruen* requires. The government could not provide even one historical regulation which disarmed, or even restricted, an individual's right to keep and bear arms on the basis of a private dispute. Moreover, the analogues the government did provide are starkly different in either the burden imposed, the justification for the regulation, or both. Hence, the district court did not err in finding § 922(g)(8) unconstitutional.

Respectfully submitted,

Thomas C. Lyons
Attorney for Sherman Kelvin Combs
201 W. Short. St., Ste. 800
Lexington, KY 40507
(859) 231-0055
thomaslyons@hotmail.com

# CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 7,262 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14-point type.

s/ Thomas C. Lyons
THOMAS C. LYONS

## CERTIFICATE OF SERVICE

I hereby certify that on November 22, 2023, I electronically filed the foregoing document with the United States Court of Appeals for the Sixth Circuit using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

s/ Thomas C. Lyons

Thomas C. Lyons

## DESIGNATION OF DISTRICT COURT RECORD

| Record Entry | Description | Page ID # |
|---|---|---|
| R.5 | Indictment | 10 |
| R.33 | Memorandum Opinion and Order | 139-141 |
| R.64 | Order Setting Condition of Release | 294 |
| R.72 | Minute Entry for Status Conference | 311 |