No. 23-5121

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

---

UNITED STATES OF AMERICA,
Plaintiff–Appellant,

v.

SHERMAN KELVIN COMBS,
Defendant–Appellee.

---

On Appeal from the United States District Court for the
Eastern District of Kentucky, No. 5:22-CR-136
(Hon. Danny C. Reeves)

---

**REPLY BRIEF FOR THE UNITED STATES**

---

CARLTON S. SHIER, IV
United States Attorney

CHARLES P. WISDOM, JR.
Assistant United States Attorney
Eastern District of Kentucky

NICOLE M. ARGENTIERI
Acting Assistant Attorney General

LISA H. MILLER
Deputy Assistant Attorney General

WILLIAM A. GLASER
Attorney, Appellate Section
Criminal Division
U.S. Department of Justice
950 Pennsylvania Ave, NW, Ste. 1264
Washington, DC 20530
(202) 532-4495
William.Glaser@usdoj.gov

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................... i

TABLE OF AUTHORITIES ...................................................... iii

INTRODUCTION ..................................................................... 1

ARGUMENT ............................................................................ 2

Section 922(g)(8) Is Constitutional Under the Second Amendment. ............... 2

A.    The Second Amendment allows Congress to disarm those who are not law-abiding, responsible citizens. ............................ 2

    1.    The Supreme Court's decisions have recognized this limitation on the right. ....................................... 3

    2.    History supports this limitation. ........................................ 5

    3.    Those subject to domestic-violence restraining orders are not responsible. ............................................... 6

    4.    Combs's contrary arguments are unavailing. ..................... 7

B.    Section 922(g)(8) is consistent with the historical tradition of disarming dangerous and irresponsible people. ........................... 9

    1.    *Bruen* did not create a two-tiered test that requires a "distinctly similar" historical analogue here. ................... 10

    2.    Historical laws applicable to domestic violence do not call § 922(g)(8) into question. .......................................... 12

    3.    The government can rely on the principle of dangerousness. ............................................................... 13

    4.    The historical record supports disarming dangerous people. ........................................................................ 17

        i.    English and colonial statutes ................................. 17

        ii.    Surety laws ............................................................. 22

     iii.    Nineteenth-century laws disarming other
            irresponsible people .............................................. 25

CONCLUSION.................................................................... 27

CERTIFICATE OF COMPLIANCE ........................................... 28

# TABLE OF AUTHORITIES

## Cases

*Barrett v. United States*,
 423 U.S. 212 (1976) .................................................................................... 16

*District of Columbia v. Heller*,
 554 U.S. 570 (2008) ...........................................................*passim*

*Folajtar v. Attorney General*,
 980 F.3d 897 (3d Cir. 2020) ...............................................................19, 20

*Heller v. District of Columbia*,
 670 F.3d 1244 (D.C. Cir. 2011) .............................................................. 7

*In re Neagle*,
 135 U.S. 1 (1890) ................................................................................ 20

*Ingram v. Wayne County, Michigan*,
 81 F.4th 603 (6th Cir. 2023) ................................................................. 4

*Kanter v. Barr*,
 919 F.3d 437 (7th Cir. 2019) ...........................................................14, 20

*McDonald v. City of Chicago*,
 561 U.S. 742 (2010) ............................................................................ 4

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*,
 597 U.S. 1, (2022) ...........................................................*passim*

*Parke v. Raley*,
 506 U.S. 20 (1992) ............................................................................ 24

*Respublica v. Donagan*,
 2 Yeates 437 (Pa. 1799) ................................................................23, 24

*State v. Kershaw*,
 1 Del. Cas. 218 (Del. Ct. of Quarter Sessions 1799) ................................. 24

*Stimmel v. Sessions*,
   879 F.3d 198 (6th Cir. 2018) .................................................... 6

*United States v. Castleman*,
   572 U.S. 157 (2014) ............................................................... 7

*United States v. Emerson*,
   270 F.3d 203 (5th Cir. 2001) .................................................. 20

*United States v. Hayes*,
   555 U.S. 415 (2009) ............................................................... 1

*United States v. Yancey*,
   621 F.3d 681 (7th Cir. 2010) .................................................. 25

*Williams-Yulee v. Florida Bar*,
   575 U.S. 433 (2015) ............................................................... 24

## Statutes

18 U.S.C. § 922 ........................................................................ 19

1838 Wis. Laws 380 ................................................................... 23

1847 Va. Stat. 128 ..................................................................... 23

1853 Or. Laws. 219 ................................................................... 23

Ky. Rev. Stat. § 403.740 ............................................................ 23

Mich. Comp. Laws § 600.2950 ................................................... 23

Ohio Rev. Code Ann. § 3113.31 ................................................. 23

Tenn. Code Ann. § 36-3-608 ...................................................... 23

## Other Authorities

11A Charles Alan Wright et al., *Federal Practice and Procedure* § 2948.1
   (3d ed.) ............................................................................... 20

4 William Blackstone, *Commentaries on the Laws of England* (1769) ................ 14

David Kopel & Joseph Greenlee, *The "Sensitive Places" Doctrine*, 13 Charleston L. Rev. 205 (2018) ................................................. 21

Diarmuid F. O'Scannlain, *Glorious Revolution to American Revolution: The English Origin of the Right to Keep and Bear Arms*, 95 Notre Dame L. Rev. 397 (2019) ................................................. 18

Elizabeth Pleck, *Criminal Approaches to Family Violence, 1640-1980*, 11 Crime & Just. 19 (1989) ......................................... 13

Eugene Volokh, *State Constitutional Rights to Keep and Bear Arms*, 11 Tex. Rev. L. & Pol. 191 (2006) ................................. 24

Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 Wyo. L. Rev. 249 (2020) .......... 18

Joyce Lee Malcom, *To Keep and Bear Arms* (1994) ....................................... 18

Ruth H. Bloch, *The American Revolution, Wife Beating, and the Emergent Value of Privacy*, 5 Early American Studies 223 (2007) ............................. 13

## INTRODUCTION

Congress adopted 18 U.S.C. § 922(g)(8)'s prohibition on possession of a firearm while subject to a domestic-violence restraining order to combat the "deadly combination" of "[f]irearms and domestic strife." *United States v. Hayes*, 555 U.S. 415, 427 (2009).  In this case, the district court held that § 922(g)(8) violates the Second Amendment on its face.  As the government explained in its opening brief, that decision is erroneous for several reasons. First, those subject to qualifying domestic-violence restraining orders are not "responsible citizens," and they can therefore be constitutionally disarmed. *District of Columbia v. Heller*, 554 U.S. 570, 635 (2008).  Second, § 922(g)(8)'s prohibition is consistent with America's historical tradition of firearm regulation, which supports disarming those who are dangerous.

In his response brief, Defendant–Appellee Sherman Combs fails to rebut the government's arguments and fails to demonstrate that § 922(g)(8) is unconstitutional.  If this Court chooses not to hold this case for the Supreme Court's pending decision *United States v. Rahimi*, No. 22-915 (oral argument held Nov. 7, 2023), it should reverse the district court's dismissal of Count 1 of the indictment.

## ARGUMENT

**Section 922(g)(8) Is Constitutional Under the Second Amendment.**

As the opening brief explains, the district court erred by concluding that § 922(g)(8) violates the Second Amendment. The right protected by the Second Amendment's text is "not unlimited" and belongs to "law-abiding, responsible citizens," *District of Columbia v. Heller*, 554 U.S. 570, 626, 635 (2008), a group that excludes those subject to domestic-violence restraining orders. And, in any event, § 922(g)(8) is "consistent with the Nation's historical tradition of firearm regulation," *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 24 (2022), which supports the disarming of dangerous persons.

### A. The Second Amendment allows Congress to disarm those who are not law-abiding, responsible citizens.

Under *Bruen*, courts considering Second Amendment challenges must first consider whether "the Second Amendment's plain text covers an individual's conduct." *Bruen*, 597 U.S. at 24. The Second Amendment's text, as interpreted by the Supreme Court, does not protect the conduct covered by Section 922(g)(8) because that provision applies only to those who are not "responsible citizens." *Heller*, 554 U.S. at 635.

2

### 1.    The Supreme Court's decisions have recognized this limitation on the right.

The Supreme Court's decisions have described the Second Amendment right as belonging to "law-abiding, responsible citizens." *Heller*, 554 U.S. at 635; *Bruen*, 597 U.S. at 70.  Combs contends that these repeated references to "law-abiding, responsible citizens" do not signify a limit on the Second Amendment's scope because they "served a purely *descriptive* function" with respect to the challengers in those cases and were "used to emphasize that there are 'presumptively lawful' prohibitions on certain categories of persons, i.e., felons and the mentally ill." Br. 5.  Combs is incorrect.

The Supreme Court spoke of "law-abiding, responsible citizens" when describing the scope of "the right" protected by the Second Amendment. *Heller*, 554 U.S. at 635; *Bruen*, 597 U.S. 26, 70.  And the Court incorporated that standard into several parts of the legal analysis.  It said that, in judging whether a modern firearms regulation is consistent with a historical precursor, a court must ask "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Bruen*, 597 U.S. at 29.  It said that, in judging whether a weapon is in common use (and therefore protected by the Second Amendment), a court must consider whether the weapon is "typically possessed by law-abiding citizens for lawful purposes." *Heller*, 554 U.S. at 625.  And it said that states may require applicants for gun permits to pass

background checks and take safety courses because such requirements ensure that those who carry guns "are, in fact, 'law-abiding, responsible citizens.'" *Bruen*, 597 U.S. at 38 n.9.  Thus, the term was more than simply an off-handed description of the challengers in *Heller* and *Bruen*.

Combs next argues that accepting a "law-abiding, responsible" limitation would be to "reject *Bruen*'s rights-protective analysis," Br. 7 (boldface and quotation marks omitted), and to make the Second Amendment a "'second-class right,'" Br. 8 (quoting *Bruen*, 597 U.S. at 70).  That is not true.  *Bruen* recognized that the right to bear arms "is not 'a second-class right.'"  *Bruen*, 597 U.S. at 70 (quoting *McDonald v. City of Chicago*, 561 U.S. 742, 780 (2010) (plurality opinion)).  Yet *Bruen* used a variation of the term "law-abiding, responsible citizen" more than a dozen times when describing the Second Amendment's scope.  *See* Opening Br. 16 & n.4.  For this reason, Combs is also incorrect in claiming that the government's reliance on this term "attempt[s] to salvage means-end scrutiny."  Br. 7.  *Bruen* specifically rejected means-end scrutiny, *Bruen*, 597 U.S. at 18-24, yet repeatedly described the Second Amendment as protecting law-abiding or responsible citizens.

Moreover, although *Bruen*'s text-and-history framework may be "rights-protective," *Ingram v. Wayne County, Michigan,* 81 F.4th 603, 624 (6th Cir. 2023) (Thapar, J., concurring), that does not mean the Second Amendment

4

right is "unlimited." *Heller*, 554 U.S. at 626. As *Heller* observed, "[f]rom Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id.* Thus, there is no inconsistency between a "rights-protective" text-and-history approach and recognizing certain well-established limits on the Second Amendment.

### 2. History supports this limitation.

As the opening brief explains, the Second Amendment's history confirms that it does not protect the right of lawbreakers and irresponsible people to possess firearms. Opening Br. 17-19. Among other sources, the Second Amendment precursors proposed at state ratifying conventions support that conclusion. Opening Br. 18-19.

Combs contends that the government's reliance on "isolated, unadopted proposals" in state ratifying conventions is "unimpressive" because those proposals "failed to become incorporated into the Second Amendment." Br. 6. But *Heller* explained that the Second Amendment codified a "venerable, widely understood" right. *Heller*, 554 U.S. at 605. Thus, although the Second Amendment did not adopt their exact language, these proposals are relevant to understanding the contemporary understanding of the right. Accordingly,

*Heller* referred to these proposals "in the state conventions" as "Second Amendment precursors" and observed that the Pennsylvania proposal was "highly influential." *Id.* at 603-04.

Combs contends that this Court "already rejected the government's use of these [ratifying] conventions," Br. 6, citing the Court's decision in *Stimmel v. Sessions*, 879 F.3d 198, 205 (6th Cir. 2018). *Stimmel* was a pre-*Bruen* case involving § 922(g)(9)'s prohibition on firearm possession by domestic violence misdemeanants. *Stimmel* found the ratification proposals cited in *Heller* insufficient to establish that "domestic violence misdemeanants . . . fall outside the Second Amendment's scope of protection altogether." *Stimmel*, 879 F.3d at 205. But *Stimmel* involved a different provision in § 922(g) than this case. *Id.* And the government's argument in *Stimmel* was focused on the "crimes committed" aspect of the Pennsylvania proposal, rather than the "danger of public injury" language, which is relevant here. *Id.* (quotation marks omitted). So *Stimmel* does not prevent the Court from considering these ratification convention proposals in the context of § 922(g)(8).

### 3. Those subject to domestic-violence restraining orders are not responsible.

As the opening brief demonstrated, individuals subject to qualifying restraining orders are not "responsible" because they pose a danger to others, including their intimate partners or children, police, and the public at large.

Opening Br. 19-22.  Combs contends that "the government's proffered statistics . . . are irrelevant under *Bruen*'s historical standard" because "[n]ow, the focus is on plain text and history."  Br. 7.  He is incorrect.

At the textual step of the *Bruen* inquiry, studies and statistics can show that conduct falls inside or outside the Second Amendment's scope.  For example, statistics are useful to determine whether certain arms are "in common use."  *See Heller v. District of Columbia*, 670 F.3d 1244, 1261 (D.C. Cir. 2011); *id.* at 1287 (Kavanaugh, J., dissenting).  In the same way, they can provide relevant evidence to determine whether certain categories of possessors are law-abiding and responsible or else dangerous.  *Cf. United States v. Castleman*, 572 U.S. 157, 159-60 (2014) (citing statistics about the dangers of armed domestic violence when interpreting § 922(g)(9)).  Similarly, when considering whether modern and historical laws are "comparably justified," *Bruen*, 597 U.S. at 29, statistical evidence can be highly relevant to demonstrate that a modern law addresses a significant societal problem or targets a dangerous group.  The government's reliance on statistical studies was therefore entirely consistent with *Bruen*.

### 4.    Combs's contrary arguments are unavailing.

Combs devotes substantial attention to the contention that he is part of "the people" protected by the Second Amendment, Br. 4-8, and argues that

7

this Court should reject "the government's newfound definition of 'the people,'" Br. 8. Combs misconstrues the government's argument. The government has argued elsewhere that felons are not part of "the people" protected by the Second Amendment. *See* Petition for Writ of Certiorari at 11-13, *Garland v. Range*, No. 23-374 (filed Oct. 5, 2023). But it has never suggested that those subject to domestic-violence restraining orders are not part of "the people." *See* Opening Br. 39 (explaining that the government "never made" this argument). As the opening brief explained, legislatures have power to disarm even those among "the people" who are not law-abiding and responsible. *See* Opening Br. 16-22. Combs's focus on "the people" is therefore not responsive to the government's argument.

Combs next wrongly contends that the government "tries to shift the Court's focus from the proper inquiry of *conduct* to one of *status*." Br. 9. In fact, many prohibitions on conduct are also tied to status, such as "longstanding prohibitions on firearm possession by felons and the mentally ill." *Heller*, 554 U.S. at 626. Nothing in *Heller* or *Bruen* suggests that Congress cannot prohibit the "conduct" of firearm possession by certain categories of dangerous and non-law-abiding people.

Combs incorrectly claims that the only "conduct" prohibited by § 922(g)(8) is "possession of a firearm." Br. 2, 9. But Section 922(g)(8)

prohibits possession of a firearm *while subject to a domestic-violence restraining order*. Thus, § 922(g)(8) does not prohibit mere "possession of a firearm" any more than § 922(g)(1)'s felon-possession ban or § 930's prohibition on firearm possession in federal buildings and courthouses punish mere "possession of a firearm." A Second Amendment analysis based on "conduct," Br. 9, cannot selectively ignore some of a crime's elements. Because those subject to qualifying restraining orders pose a danger to others—and are therefore not "responsible"—they can be disarmed consistently with the Second Amendment.

**B.    Section 922(g)(8) is consistent with the historical tradition of disarming dangerous and irresponsible people.**

Section 922(g)(8)'s prohibition on firearm possession by those subject to qualifying protective orders is also consistent with America's tradition of disarming dangerous people. Combs spends most of his brief defending the district court's conclusion that "the government failed to proffer a proper historical analogue [for] § 922(g)(8)." Br. 10 (boldface omitted); *see* Memorandum Opinion and Order, R.33, Page ID #132. Like the district court, however, Combs attempts to distinguish each analogue based on minor differences, while overlooking important similarities. In so doing, Combs improperly demands that the government provide something akin to a "dead ringer" or "historical *twin*" for § 922(g)(8), rather than identifying "relevantly

similar" regulations.  *Bruen*, 597 U.S. at 29-30.  And his arguments are
ultimately insufficient to demonstrate that § 922(g)(8) is unconstitutional on its
face.

### 1.  *Bruen* did not create a two-tiered test that requires a "distinctly similar" historical analogue here.

Combs first contends that the government must identify "distinctly
similar"—as opposed to "relevantly similar"—historical regulations where
"the societal problem underlying the [modern] regulation has 'persisted since
the 18th century.'"  Br. 10 (quoting *Bruen*, 597 U.S. at 26).  *Bruen* did not create
such a two-tiered test.  *Bruen* set out a variety of guideposts for "assess[ing]
whether modern firearms regulations are consistent with the Second
Amendment's text and historical understanding."  *Bruen*, 597 U.S. at 26.  But
these guideposts were all part of a single test for determining whether a modern
regulation is "analogous enough" to "historical precursors" to "pass
constitutional muster."  *Id.* at 30.  The Court explained that "determining
whether a historical regulation is a proper analogue for a distinctly modern
firearm regulation requires a determination of whether the two regulations are
'relevantly similar.'"  *Id.* at 28-29.  Although the Court did not provide "an
exhaustive survey of the features that render regulations relevantly similar
under the Second Amendment," it identified "two metrics: how and why the

regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 29.

*Bruen* used the term "distinctly similar" just once, observing that where a modern regulation "addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation" is "relevant evidence" that the modern regulation is unconstitutional. *Bruen*, 597 U.S. at 26.  In conducting its historical survey of public carry laws, *Bruen* never referenced the purported "distinctly similar" standard, even though the public carrying of firearms is a societal problem that has persisted for centuries. *See id.* at 27.  Accordingly, *Bruen*'s single reference to a "distinctly similar" regulation does not suggest that it created a separate standard for certain types of modern regulations.

Even if *Bruen* did establish a two-tiered test, the government would only need to identify "relevantly similar" regulations because § 922(g)(8) addresses societal circumstances different from those that existed at the founding. *See* Opening Br. 32-35.  Contrary to Combs's claim, the government did not "openly admit[] it cannot satisfy the more stringent 'distinctly similar' burden." Br. 2 (citing Opening Br. 35).  The government simply argued that § 922(g)(8) is "consistent with the historical tradition even though it does not burden firearm possession in precisely the same way or for precisely the same reasons

11

as founding-era laws." Opening Br. 35. The same is true of many modern laws, such as prohibitions on firearm possession by felons and the mentally ill, but that does not mean such regulations are unconstitutional.

### 2. Historical laws applicable to domestic violence do not call § 922(g)(8) into question.

Combs devotes considerable attention to arguing that "domestic violence has always been a concern—and crime—in America." Br. 15. It is unclear why that matters. The government's opening brief recognized that some historical laws, such criminal laws against assault and surety laws, could be used to punish or prevent spousal violence. Opening Br. 34. But the government explained that the absence of historical laws "exactly like § 922(g)(8)" did not indicate that historical legislatures believed such laws infringed on the right to bear arms. Opening Br. 32-33. It explained that founding-era legislatures might not have adopted historical twins for a variety of reasons, including the low rate of domestic homicides (particularly those committed with firearms) or a perception that other laws adequately protected spouses from gun violence. Opening Br. 33-35.

In any event, Combs overstates the extent to which American jurisdictions specifically targeted domestic abuse. As one of his cited sources explains, except for a few New England colonies, "American colonies showed no special concern about family violence." Elizabeth Pleck, *Criminal*

12

*Approaches to Family Violence, 1640-1980*, 11 Crime & Just. 19, 28 (1989). "No laws against family violence were passed from the time of the Pilgrim statute against wife beating in 1672 until a law against wife beating was enacted in Tennessee in 1850." *Id.* at 29. As another of Combs's cited sources explains, the primary means of addressing domestic violence was through wives suing for breach of the peace or (in the 19th century) prosecution for assault and battery. *See* Ruth H. Bloch, *The American Revolution, Wife Beating, and the Emergent Value of Privacy*, 5 Early American Studies 223, 232-36, 238-40 (2007). But regardless of the exact extent to which domestic violence was targeted at the founding, nothing in the historical record indicates that legislatures would have understood a provision like § 922(g)(8) to violate the right to keep and bear arms. As the opening brief explained, there is a long historical tradition of disarming those who pose a danger to others. Opening Br. 23-31.

### 3. The government can rely on the principle of dangerousness.

The opening brief explained that § 922(g)(8) is consistent with the historical tradition of disarming those who are irresponsible or dangerous. Opening Br. 22-31. Combs raises a methodological objection, arguing that the government must do more than "establish a historical *principle*" such as "[d]angerousness" to support a modern regulation. Br. 15; *see* Br. 21 (criticizing the government's "broad dangerousness principle"). In his view,

13

*Bruen* demands "a side-by-side inspection of the historical and modern regulations." Br. 15. Combs is incorrect.

The Supreme Court's Second Amendment cases have extracted other principles from the historical record. For example, *Heller* concluded that history supports the constitutionality of restrictions on firearm possession in "sensitive places such as schools and government buildings." *Heller*, 554 U.S. at 626. And *Bruen* said that "courts can use analogies to . . . historical regulations of 'sensitive places' to determine that modern regulations prohibiting the carry of firearms in *new* and analogous sensitive places are constitutionally permissible." *Bruen*, 597 U.S. at 30. Similarly, *Heller* determined that the Second Amendment protects only weapons "in common use at the time," a limitation that "is fairly supported by the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" *Heller*, 554 U.S. at 627 (some quotation marks omitted) (quoting 4 William Blackstone, *Commentaries on the Laws of England* 148-49 (1769)). In the same way that the Supreme Court drew on history to recognize these broader principles relating to "sensitive places," firearms in "common use," and "dangerous and unusual weapons," so too can courts draw on history to determine that "legislatures have the power to prohibit dangerous people from possessing guns." *Kanter v. Barr*, 919 F.3d 437, 451 (7th Cir. 2019) (Barrett, J., dissenting).

The government's focus on dangerousness is also consistent with *Bruen*'s explanation that, in conducting a historical inquiry, courts should consider "how and why" regulations burden the right to armed self-defense. *Bruen*, 597 U.S. at 29. For many historical laws, the answer to "why" certain people were disarmed is that they were considered dangerous. Thus, in considering whether historical and modern laws are "comparably justified," *id.*, the appropriate inquiry can consider whether those laws disarmed dangerous persons.

Contrary to Combs's contention, recognizing that Congress may disarm the dangerous would not cause the "dangerousness principle" to "swallow the whole," Br. 21, or allow legislatures to disarm people "regardless of how tenuous" the concern about public safety may be, Br. 16. Just as courts may review a legislature's judgment that a particular weapon is "dangerous and unusual," or that a particular place is "sensitive," s*ee Heller*, 554 U.S. at 626-27 (quotation marks omitted), courts may properly review a legislature's judgment that a category of persons would pose a danger if armed. Courts may ask, for example, whether that judgment is supported by evidence, common sense, or the judgments of other American legislatures today or over time. The government's view simply recognizes Congress's authority, subject to judicial review, "to keep firearms away from the persons Congress classified as

15

potentially irresponsible and dangerous." *Barrett v. United States*, 423 U.S. 212, 218 (1976).

In any event, even if Combs were right that courts must ignore "historical principle[s]" and conduct only a "side-by-side inspection of the historical and modern regulations," Br. 15 (emphasis omitted), the government did so here. The opening brief explained that, "[l]ike surety statutes, § 922(g)(8) burdens the firearm possession of those who present a credible threat to others—with the aim of protecting individuals (and society) from dangerous people." Opening Br. 40. It explained that, "[l]ike loyalty oath laws, § 922(g)(8) is designed to ensure that people who cannot be trusted with firearms are disarmed during the duration of their untrustworthiness." *Id.* at 40-41. And it explained that, "just as a person subject to surety or loyalty-oath laws could regain firearm possession by posting a bond or swearing an oath of allegiance . . . , a person subject to a protective order can seek to terminate the order by showing that he no longer presents a threat to his intimate partner or child." *Id.* at 41.

The government conducted a similar side-by-side analysis in its district court briefing, R.25, Page ID #75-76, and so did the magistrate judge (though only with respect to surety laws), R.27, Page ID #109-14. Although Combs

16

disputes the adequacy of the historical analogues cited by the government, he fails to establish any shortcomings in the opening brief's methodology.

### 4.    The historical record supports disarming dangerous people.

As the opening brief explained, there is a broad consensus among courts and commentators that the historical tradition supports disarming dangerous people, at the very least.  Opening Br. 22-23.  It also explained how that consensus view finds extensive support in historical sources such English history, colonial laws, and 19th-century laws.  Opening Br. 23-31.  Combs's attempts to refute the government's historical arguments are unavailing.

### i.    English and colonial statutes

Combs wrongly contends that the English and colonial American traditions fail to support § 922(g)(8).  Br. 17-23.  He first argues that English and colonial laws treated "dangerousness" as "a *political* categorization" and "[e]xclud[ed] citizens from exercising their rights based on political and religious ideology."  Br. 17, 20 (boldface omitted).  That is an overly simplistic view of the history, and it does not justify disregarding those traditions.

Combs is correct that the English Militia Act of 1662 was often used to disarm people based on religious distinctions, depending on whether a Catholic or Protestant was on the throne.  *See* Diarmuid F. O'Scannlain, *Glorious Revolution to American Revolution: The English Origin of the Right to Keep*

17

*and Bear Arms*, 95 Notre Dame L. Rev. 397, 401-03 (2019). This was based on the real or perceived danger that those out of power were engaging in plotting violence against those in power. *See id.* at 402 (referencing the fabricated Popish Plot and the Rye House Plot during Charles II's reign and the later plot to depose James II); Joyce Lee Malcom, *To Keep and Bear Arms* 85, 92, 99-101 (1994) (discussing these same plots). But the fact that the term "dangerous" was often applied to political opponents does not undermine the larger principle that dangerous people could be disarmed, a principle that the English Bill of Rights did not call into question. *See* Opening Br. 23-24. Regardless of how the 1662 Militia Act might have been used or abused, the basic premise that dangerous people could be disarmed was essentially undisputed.

The same is true of colonial American laws disarming loyalists, which Combs contends were "politically motivated." Br. 21. Although those laws "may have sometimes been misused to punish political dissidents, . . . as was the case with all disarmaments during the colonial period, the justification was always that those being disarmed were dangerous." Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 Wyo. L. Rev. 249, 265 (2020).

Combs's argument that dangerousness was a purely political category is also undermined by the common-law tradition, codified in the Statute of

18

Northampton and in colonial American statutes, of disarming those who spread fear or terror. *See* Opening Br. 25-26 & nn.7-9. Though not specifically couched in terms of "danger," these prohibitions clearly "authorized disarming the dangerous." *Folajtar v. Attorney General*, 980 F.3d 897, 914 (3d Cir. 2020) (Bibas, J., dissenting).

Combs argues that Northampton-style laws disarming those who caused "fear" or "terror" differ from § 922(g)(8) because they required "a *conviction*." Br. 19. Although § 922(g)(8) does not require a conviction, it requires a judicial determination, after notice and a hearing, that either (i) the person poses a "credible threat to the physical safety of [the person's] intimate partner or child" or (ii) it is appropriate to "explicitly prohibit[] the use, attempted use, or threatened use of physical force against such intimate partner or child." 18 U.S.C. § 922(g)(8)(B). And states have long disarmed groups other than convicted criminals, such as those subject to surety orders, minors, intoxicated persons, and the mentally ill. *See* Opening Br. 27-31 & nn.11-16.

Combs points out that § 922(g)(8)(B)(ii) applies to orders that prohibit threatened, attempted, or actual use of force without any "finding" of "dangerousness" and that protective orders can be based on a "stipulation." Br. 16, 25. He therefore contends that § 922(g)(8)'s prohibition rests on "conjecture" because it disarms those who are only "*potentially dangerous*" or

19

"*hypothetically* dangerous."  Br. 2, 16.  But a court ordinarily will enter a prohibition that satisfies § 922(g)(8)(B)(ii) only if "evidence credited by the court reflected a real threat or danger of injury to the protected party."  *United States v. Emerson*, 270 F.3d 203, 262 (5th Cir. 2001); *see* 11A Charles Alan Wright et al., *Federal Practice and Procedure* § 2948.1 (3d ed.) (observing that, under traditional equitable principles, courts do not grant injunctive relief to address "an unfounded fear" or a "possibility of some remote future injury").

Combs next contends that "fear" or "terror" laws do not support § 922(g)(8) because they required "firearm misuse" as a "prerequisite."  Br. 19.  This distinction does not matter.  Our legal system has long sought both to "prevent crime" in the first place and to punish crimes "after they have been committed."  *In re Neagle*, 135 U.S. 1, 59 (1890).  Thus, there is general agreement that the historical record supports disarming "those who pose a danger to public safety, whether or not they have committed a crime."  *Kanter*, 919 F.3d at 456 (Barrett, J., dissenting); *see Folajtar*, 980 F.3d at 914 (Bibas, J., dissenting) (observing that historical laws disarmed "potential rebels who were dangerous before they erupted into violence").  In short, Combs fails to show that the historical prohibition on carrying firearms in a way that causes fear is inadequate as a historical analogue for § 922(g)(8).

20

Combs finally contends that "the *three* adopted versions of the Statute of Northampton offered by the government" do not show "a 'well-established' historical tradition" in America. Br. 21 (citing *Bruen*, 597 U.S. at 46). But the government cited justice-of-the-peace manuals indicating that the common-law offense was recognized in American colonies even where not codified by statute. Opening Br. 26 & n.8. And when *Bruen* expressed doubt that "*three* colonial regulations" was sufficient to "show a tradition of public-carry regulation," *Bruen*, 597 U.S. at 46, it did so in the face of extensive countervailing authority indicating that governments could not categorically prohibit public carry for ordinary self-defense. *See, e.g., id.* at 45, 51-54. *Bruen* did not suggest that, in the absence of any countervailing evidence, three statutes would be insufficient to reflect a historical tradition.

In fact, when concluding that "sensitive places" laws are "constitutionally permissible," *Bruen* cited a law review article identifying sensitive-places laws in only two jurisdictions prior to Reconstruction. *Bruen*, 597 U.S. at 30 (citing David Kopel & Joseph Greenlee, *The "Sensitive Places" Doctrine*, 13 Charleston L. Rev. 205, 229-36, 244-47 (2018)). *Bruen* acknowledged that "the historical record yields relatively few 18th- and 19th-century 'sensitive places' where weapons were altogether prohibited," but observed that it was "aware of no disputes regarding the lawfulness of such

21

prohibitions" and could therefore "assume it settled that these locations were 'sensitive places' where arms carrying could be prohibited consistent with the Second Amendment." *Id.* Thus, *Bruen* indicates that even a handful of statutes can establish a historical tradition where the laws' constitutionality was not in dispute, as is true of the colonial statutes here.

### ii. Surety laws

As explained in the opening brief, both the common-law surety system that applied in the American colonies and 19th-century surety laws are analogous to § 922(g)(8). Opening Br. 27-29. Combs concedes that surety laws and § 922(g)(8) "are comparably justified" because they share "the purpose of protecting individuals from the reasonable likelihood of harm." Br. 26. But he incorrectly contends that surety laws "cannot serve as a sufficient historical analogue to § 922(g)(8)" because "the burdens are incomparable." Br. 26.

Combs first argues that surety laws "imposed more of an inconvenience than a burden" because a person could still carry firearms if he posted a bond or showed a need for self-defense. Br. 27. But *Bruen* does not require an *identical* burden, and surety laws unquestionably burdened the carrying of firearms by those who threatened others. Combs points out that protective orders in some states last for several years, whereas 19th-century surety

22

requirements were usually capped at six or 12 months.  Br. 28.  But the

maximums in the surety statutes applied only to orders issued by justices of the

peace or magistrates and did not apply if an order was appealed to a court of

general jurisdiction.  *See, e.g.*, 1838 Wis. Laws 380, §§ 9, 11 (district court could

order a new recognizance "for such time as the court shall think proper"); 1847

Va. Stat. 128, ch. 14, §§ 9, 11 (same); 1853 Or. Laws. 219, ch. 16, §§ 10, 12

(same).  And under the common-law tradition applicable at the founding,

sureties could be required "for any number of years that the public safety

requires."  *Republica v. Donagan*, 2 Yeates 437, 438 n.* (Pa. 1799).

Moreover, many modern protective order regimes contain statutory

maximums.  *See, e.g.*, Ky. Rev. Stat. § 403.740(4) (three years); Ohio Rev.

Code Ann. § 3113.31(E)(3)(a) (five years); Tenn. Code Ann. § 36-3-608(a) (one

year).  And a person who no longer presents a threat to an intimate partner or

child can ordinarily seek to modify or set aside the order.  *See, e.g.*, Mich.

Comp. Laws § 600.2950(13); Ohio Rev. Code Ann. § 3113.31(E)(8); Tenn.

Code Ann. § 36-3-608(b).  So protective orders do not impose a significantly

heavier burden than the historical surety requirements.

Combs argues that there is no evidence the surety laws were enforced

because "there is only one recorded case and a handful of pretextual

examples."  Br. 30; *see Bruen*, 597 U.S. at 58 (lack of evidence of enforcement).

There is, however, evidence that the earlier common-law surety practice was enforced. *See, e.g.*, *Donagan*, 2 Yeates at 437; *State v. Kershaw*, 1 Del. Cas. 218, 219 (Del. Ct. of Quarter Sessions 1799). And even if the 19th-century laws were infrequently enforced, they nevertheless indicate that legislatures understood such laws to be within their constitutional power to enact, despite Second Amendment analogues that existed in many states. *See Heller*, 554 U.S. at 602; Eugene Volokh, *State Constitutional Rights to Keep and Bear Arms*, 11 Tex. Rev. L. & Pol. 191, 193-204 (2006). In short, these surety laws were, by Combs's own admission, comparable to § 922(g)(8) in their justification. Br. 26. And they should not be discarded as analogues based on minor differences in the severity or duration of the burdens they imposed.

Finally, Combs suggests that domestic-violence restraining orders are often issued without justification, claiming that their "rate of . . . issuance is high" and that courts are "overly eager to grant protective orders." Br. 27. But judges, including state judges, are presumed to decide cases based on the facts and the law. *See Williams-Yulee v. Florida Bar*, 575 U.S. 433, 446-47 (2015). And a judicial decree, such as a protective order, is entitled to a "presumption of regularity." *Parke v. Raley*, 506 U.S. 20, 30 (1992). Moreover, protective orders must satisfy strict requirements to trigger § 922(g)(8), including being entered after notice and a hearing and incorporating a finding of a credible

threat or else an explicit prohibition on using, attempting, or threatening

physical force.  Combs's assertion that such orders are overused is insufficient

to strike down an Act of Congress.

### iii. Nineteenth-century laws disarming other irresponsible people

The opening brief cited additional 19th-century laws that disarmed

minors, those of unsound mind, vagrants, and intoxicated persons.  Opening

Br. 30-31 & nn.13-16.  Combs wrongly contends that these laws fail as

historical analogues for § 922(g)(8).  He first argues that "those of 'unsound

mind' were categorically banned from possessing firearms as they were not a

part of 'the people.'"  Br. 23 (citing *United States v. Yancey*, 621 F.3d 681, 685

(7th Cir. 2010) (per curiam)).  Even if that is true, those historical prohibitions

support the argument that legislatures regularly disarmed those whose firearm

possession presented a risk of danger—whether they fell within "the people"

protected by the Second Amendment or not.

Next, Combs claims that the "three statutes" applicable to the

intoxicated are too few to establish a historical tradition.  Br. 23.  As explained

above, however, even a handful of statutes can be enough where there are "no

disputes regarding the lawfulness of such prohibitions."  *Bruen*, 597 U.S. at 30.

Combs also points out that these intoxication statutes did not regulate private

possession in the home.  But the Supreme Court has relied on "the historical

tradition of prohibiting the *carrying* of 'dangerous and unusual weapons'" to support modern bans on *possessing* machineguns. *Heller*, 554 U.S. at 627 (emphasis added). So that distinction does not prevent these statutes' use as analogues.

Combs finally observes that many of these "types of statutes" are "still around today in some form" and would allow anyone to be "prosecuted for carrying a gun while intoxicated or for using a firearm in a threatening manner." Br. 25. He suggests that they therefore cannot serve as analogues for § 922(g)(8), which "criminalizes mere possession." Br. 25-26. But the continued existence of such laws simply confirms that even now, as in the 19th century, legislatures believe that various categories of irresponsible or dangerous people can be disarmed consistently with the Second Amendment and state constitutional analogues. Although § 922(g)(8) focuses on a different category of irresponsible persons than these 19th-century laws, it is nevertheless consistent with the historical tradition. The district court's contrary decision was error.

## CONCLUSION

This Court should reverse the judgment of the district court.

Respectfully submitted,

CARLTON S. SHIER, IV
United States Attorney

NICOLE M. ARGENTIERI
Acting Assistant Attorney General

CHARLES P. WISDOM, JR.
Assistant United States Attorney
Eastern District of Kentucky

LISA H. MILLER
Deputy Assistant Attorney General

s/William A. Glaser
WILLIAM A. GLASER
Attorney, Appellate Section
Criminal Division
U.S. Department of Justice
950 Pennsylvania Ave, NW, Ste. 1264
Washington, DC 20530
(202) 532-4495
William.Glaser@usdoj.gov

## CERTIFICATE OF COMPLIANCE

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 5,617 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in Calisto MT 14-point type.

s/William A. Glaser
WILLIAM A. GLASER
